BARBER v. REO MOTOR CAR SALES CO.

(District Court, S. D. New York.  June 12, 1917.)

1. PATENTS ⚖=314—DISMISSAL BY PLAINTIFF.
    While a plaintiff cannot dismiss his bill, so as to deprive a defendant of rights established during the progress of the trial, plaintiff, in a suit for infringement of a patent, may, after the introduction of evidence and before submission, withdraw his charge of infringement as to one claim of the patent and proceed as to another.

2. PATENTS ⚖=167(1)—CLAIMS—DRAWINGS.
    Drawings attached to a patent may be used to explain any obscurity in the specifications, and to show the form and position of the parts.

3. PATENTS ⚖=59—PRIOR ART—EVIDENCE.
    Though foreign patents were not issued more than two years before plaintiff's application, so as to constitute a bar under Rev. St. § 4886 (Comp. St. 1916, § 9430), yet, where the date of their issuance antedated that of plaintiff's invention, such patents were properly cited to show anticipation or prior state of the art.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. PATENTS ☞328—INFRINGEMENT—ANTICIPATION.

    Barber patent, No. 781,802, for improvements in valves and valve gear for explosive engines, *held* anticipated and limited by the prior state of the art, and, as limited, not to be infringed by defendant's device.

In Equity. Bill by William Barber against the Reo Motor Car Sales Company. Bill dismissed.

Fred Francis Weiss, of New York City (Samuel E. Darby, of New York City, of counsel), for plaintiff.

Wetmore & Jenner, of New York City (Edmund Wetmore, Lawrence E. Sexton, and Robert D. Eggleston, all of New York City, of counsel), for defendant.

HAZEL, District Judge. The Barber patent, No. 781,802, dated February 7, 1905, on application filed February 24, 1902, for improvements in valves and valve gear for explosive engines, is asserted by complainant to be infringed by the defendant company as to claim 9 only, which is for an exhaust valve and operating mechanism in its adaptation and use of an inlet valve in combination with an explosion motor. The case was tried before me in open court, and evidence taken relating to infringements of claims 8 and 9 for the inlet and exhaust valve, respectively; but after the summing up of counsel was completed complainant offered to withdraw claim 8, relating to the inlet valve, from further consideration, and to rely solely on claim 9. Defendant objected to the proposed withdrawal, and nothing further was done at the time; but since then complainant has notified defendant's solicitor in writing that he elected to withdraw claim 8 as an issue herein. Defendant, still opposing such withdrawal, contends that, as much of the evidence taken related to claim 8, its validity should be determined by the court.

[1] Ordinarily a plaintiff has the undoubted right to dismiss his bill at any time upon the payment of costs, even where the case has been tried and the defense made; but, when it appears that during the progress of a trial rights of a defendant have been established, it is not, it has been held, just to deprive him of them. Chicago & Alton R. R. Co. v. Union Rolling Mill Co., 109 U. S. 702, 3 Sup. Ct. 594, 27 L. Ed. 1081. In Georgia Pine Turpentine Co. v. Bilfinger et al. (C. C.) 129 Fed. 131, the trial court held that, where a preliminary injunction had previously been granted, the plaintiff would not be permitted, after the case was tried, to dismiss the bill without prejudice, and as it appeared that infringement was not proven the defendant was entitled to a decree on the merits. But no such extreme condition is here presented. The withdrawal of a single claim after the taking of evidence and the summing up of counsel was not prejudicial to the rights of the defendant, and is an expedient not infrequently resorted to in patent litigation. In Thomson-Houston Electric Co. v. Elmira & H. Ry. Co. (C. C.) 71 Fed. 886, Judge Coxe distinctly approved such procedure, remarking that the practice should be encouraged.

[2-4] Therefore, without ruling as to claim 8, though incidental refer-

ence thereto is necessary, the issues will be narrowed to claim 9, which reads as follows:

"9. In an explosion motor, the combination with an explosion chamber having a T-shaped gas passage, the main central or stem portion of which forms the exhaust orifice of the explosion chamber of a screw plug closed at the outer end, open at the inner end, and having a perforated peripheral wall, so as to give free communication between the central hollow thereof and the main stem or central passage and the explosion chamber located in the head portion of the T-shaped passage, a puppet valve, the stem of which projects outward through the head of the plug seated upon the inner end of the plug, so as to cut off communication between the main stem portion of the T-passage and the explosion chamber, except when the same is forced away from the seat and toward the explosion chamber, a spring for normally keeping the valve in the closed position and means for forcing the valve stem inward, so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof, so as to permit of removal of the plug and valve by the unscrewing of the plug, substantially as shown and described."

Said claim relates wholly to an exhaust valve structure having a screw plug and valve cage and mechanism for taking it out of its casing by unscrewing the plug. It has five elements: (1) The explosion chamber, with a T-shaped gas passage forming the exhaust orifice of the explosion chamber; (2) a screw plug; (3) a puppet valve; (4) a spring for keeping the valve closed; (5) means for opening the valve by forcing the valve stem inward and for removal of the stem by unscrewing the plug, as is more particularly described therein.

Valves of different kinds and appearances are necessary appliances for combustion engines. A comparison of claims 8 and 9 discloses an additional element in the latter for removing the exhaust valve without disconnecting any operating mechanism. The desired result, according to the specification, is secured by first taking out the set screw *42* to permit turning aside cam rod *40*, journaled at the lower end, thus bringing the extension arm *41* out of line or jointure with the valve stem and allowing the covering for the valve to be unscrewed. To replace the exhaust valve it is necessary simply to screw the screw plug back into the casing and turn the cam rod back in line with the under portion of the valve stem, thus joining them, and to hold the cam rod in contact with the valve stem at the elongated slot, permitting its reciprocation.

The Barber patent in suit was held valid and infringed in a prior litigation between the patentee and the Otis Motor Sales Company (D. C.) 231 Fed. 755 (affirmed 240 Fed. 723, —— C. C. A. ——), and in that case the issues were substantially the same as here, involving the same operating mechanisms. The evidence, however, as to the validity or scope of the involved claim, is more complete, and a different prior art is submitted herein, which persuades me to another conclusion. An understanding of the inlet valve would, I think, be helpful to an understanding of the essential features of claim 9. The inlet valve is used in connection with an explosive motor having the usual cylinder and piston operated by a crank shaft, the gas entering the cylinder through openings in the wall of a screw plug or valve cage, which incloses or covers a valve ordinarily kept closed by a spring

around its stem. It is opened by air pressure, and the vapor allowed to pass into the explosion chamber of the motor; it is seated on a ring and firmly held in position by the screw-threaded valve cage, which screws into the inlet orifice and may be locked therein. The exhaust valve, although made somewhat differently, also has a screw plug valve cage with perforated side walls, closed at the lower end and open at the upper end. The valve cage, covering the valve, is made to screw into the exhaust orifice, and is preferably located underneath the inlet orifice; the valve stem extending through and out of the valve plug at its inner side, while the puppet valve is kept in continuous contact by a spring with the valve seat. There is also a T-shaped gas passage, as specified in the claim.

The evidence does not show that the patentee herein was the first to invent a mechanism for screwing the exhaust valve to the casing of the explosion chamber to render removal easy. Nor was he the first to connect a screw plug and valve by its stem to a cam rod, which operated the valve in its reciprocation. In the litigation before Judge Ray, involving this patent, no prior art structures or combinations, like those in the patents to Hirsch, Hall, and Jerram, to which reference is hereinafter made, were shown. Indeed, the learned court in his opinion expressly said that each and every prior patent in evidence disclosed a valve cage which had one or more obstructions to its ready removal, and that no one had fully solved the problem of ready removability until Barber came into the field. The evidence before me is persuasively to the contrary, unless the testimony offered by complainant to antedate the invention is sufficiently convincing to establish the fact.

It is undeniable that a new combination or arrangement of parts to achieve a new result constitutes a new invention, and this is true, even though the principal elements of the combination or subcombination are old, provided they have not before been assembled in a single device to produce the same result. The prior patents to Bousfield, Fessard, and Wohlgrath, which were not before the court in the prior case, seem to me clearly to show that inlet valves having in combination elements similar to complainant's, including a T-shaped gas passage, were known to the skilled in the art. For instance, in the British patent of April 3, 1900, to Bousfield, just prior to the Barber invention, there is an inlet valve (operating automatically) covered by a screw plug (the assemblage being in one piece, not in two, as in complainant's), which may be readily unscrewed from its casing. The specification explicitly states that, when the valve plug is unscrewed, there is easy access to the exhaust valve located in the valve box across from the inlet valve with a space between; their chambers being in communication with the carburetor. Although the arrangement of the valve assemblage appears to have been somewhat different from complainant's, in which the two valves are removed independently of each other, still, giving effect to Professor Pryor's testimony, it appears that the Bousfield device has in combination the various elements of claim 9 in suit, except the fifth, which relates to means for removing the exhaust valve. Such structure discloses a screw plug and

seat around a puppet valve held in place by a spring and screwed into the casing; there are perforated side walls in the screw plug for the gas to flow from the inlet to the explosion chamber when the valve is open; and there is a gas passage for allowing the incoming gas to pass to the screw plug and valve which when in position is at right angles to the inlet. There is no obstruction to the easy removal of the screw plug by unscrewing it from the casing. Its similarity to defendant's inlet valve construction is marked, and any differences there may be are in the dimensions, size of perforations, and screw thread only.

The Fessard patent, No. 639,160, issued December 12, 1899, and the French patent to Wohlgrath, show automatic inlet valves having singly the essential elements in combination of the inlet valve of the Barber patent. Fessard shows a T-shaped gas passage in the stem part, forming the inlet, with a valve seat ring located in the head portion of the passage. There are, it is true, a few structural differences relating to the size of the perforations, screw threading, and annular ring; but these are not essential differences. Their use was in connection with internal combustion, and they were operated in the same way and for the same purpose as the inlet valve of the Barber engine in suit. Accordingly, the inquiry must be whether the addition of mechanism for removing the exhaust valve created a new combination, by which a new result was accomplished. The record shows several prior patents claimed by defendant to be anticipatory.

In the Hirsch patent, No. 532,555, of 1895, there is a T-shaped gas passage, with a main central or main portion forming the exhaust orifice of the explosion chamber, together with the other elements included in claim 9. There are shown means for operating a rock lever, supported at one end by a double grooved cam. The lower end of the rock lever comes in contact with the valve stem and forces it inward to open the valve. Complainant contends that the rock lever means for actuating the valve are not practicable for automobile engines, and also that the Hirsch patent was not directed toward providing for removal of the valve. This view of the Hirsch patent is perhaps not without merit, and it may therefore be passed.

But the Hall British patent, No. 4,191, of 1899, is not believed to be open to this criticism. It provided for an exhaust valve mechanism applicable to automobiles, which could be readily and easily removed. The means employed to accomplish such object are strikingly similar to Barber's. Hall used a push rod to force the valve stem inward to open the valve, and adapted a sleeve and casing for mounting the cam rod, and pivoted it, so that, when the screw nut, which held the cam rod in an upright position, was loosened, the cam rod and sleeve around it, as well as the casing at the lower end, swung away from the exhaust valve by unscrewing the valve plug in substantially the same way as in the Barber patent. On this point the specification says:

"This enables me, by slacking out one or two screws, to swivel this cam rod out of position and withdraw the exhaust and gas valves without interfering with any other parts, and saves me from taking it out of gear or time with the crank shaft."

And again:

"The engine also has an improved arrangement of exhaust governor gear by which the exhaust and gas valve may be taken out without interfering with any of the valve parts, or without having to throw the said gear out of time with the crank shaft."

To avoid the effect of the Hall disclosure, complainant, conceding that the fifth element of claim 9 is shown, claims nevertheless that the valve structure is not disclosed to have all the elements in combination; that such structure does not have an explosion chamber with a T-shaped gas passage, the main central or main portion of which forms the exhaust orifice of the chamber, nor a screw plug open at one end and closed at the other, nor a perforated peripheral wall for communication between the central passage and the explosion chamber. But I feel that I cannot ignore the uncontradicted testimony of Professor Pryor upon these points.

It is true, as argued, that the Hall specification does not in words describe the exhaust valve and mechanism with particularity; but I agree with the expert witness that the drawing accompanying the patent to an appreciable extent indicates its form and character. On cross-examination, Professor Pryor testified that the Hall patent and drawings showed to him that the exhaust valve was screwed into the cylinder as indicated by the hex nut over the valve spring, while the screw threading and stem implied a seat ring for the valve and a T-shaped passage through which exhaust gases leave the cylinder from the explosion chamber; such gases passing under the valve and to the right or left into the exhaust orifice. There was, I think, sufficient ground for this assumption; for though the outlet from the exhaust chamber in the Hall structure was located at an angle, and had no straight-stemmed T-passage for the escape of the vapor, the gases nevertheless passed out of what is technically regarded as a T-passage. The exact kinds of screw plug and seat used are not shown in the Hall drawing; but it is evident that the valve was covered and had peripheral openings and an annular seat, with holes for gas passage. The skilled in the art would in my opinion have had no difficulty, at the time Barber applied for his patent, in understanding from the Hall specification the broad embodiment of the combination in suit.

There has never been a doubt but that drawings attached to a patent may be used to explain any obscurity in the specification; indeed, they are usually considered a part thereof, and may even be relied upon to some extent to ascertain the form and position of some of the parts. Banker v. Bostwick et al. (C. C.) 3 Fed. 517; Hogg et al. v. Emerson, 11 How. 587, 13 L. Ed. 824; Walker on Patents (5th Ed.) 71. And in Consolidated Bunging Apparatus Co. v. Metropolitan Brewing Co., 60 Fed. 93, 8 C. C. A. 485, it was substantially held in this judicial circuit, Judge Lacombe writing the opinion of the court, that a patent for a mechanical combination is anticipated by a prior device containing the same elements, although in the latter patent there was no description of the advantages of using the combination in the way pointed out in the patent last issued. There it appeared that a certain kind of valve was an element of a combination, and the drawing and specification showed a somewhat different valve; but the claim

was not limited to the latter kind of valve. See, also, Saunders et al. v. Allen, 60 Fed. 610, 9 C. C. A. 157; Keene v. New Idea Spreader Co., 231 Fed. 701, 145 C. C. A. 587; Stow v. Chicago, 104 U. S. 547, 26 L. Ed. 816.

Importance is also attached by defendant to the Jerram British patent, No. 3,720, of 1900, which has an explosion chamber with a T-shaped gas passage, the main central or stem portion of which forms the exhaust orifice of the explosive chamber, and a screw plug that closes the outer end, the inner end being open, with peripheral openings for communication between the explosion chamber and the main stem or passage. Means are also shown for forcing a puppet valve inward to open the exhaust valve, consisting of a rock lever, which engages the valve stem to open the valve. Complainant argued that such patent was not to secure the ready removability of the valve and that the arrangement was impracticable for automobile use. But, conceding this point, I nevertheless incline to the view that this patent, though not anticipatory, bears upon the scope of the claim with which we are herein concerned.

Although the Otto engine contains a valve cage with openings in the side walls, together with a T-shaped gas passage, puppet valve, and spring, it is not believed important, as it discloses no means for screwing the cage into the cylinder, and it belongs to flange valve structures considered in the Otis Case, which the patentee designed to improve.

But, if I am not mistaken in believing that the valve mechanism of Barber was not in a broad sense new, a question certainly arises as to whether, in view of other prior devices showing cam rods and rocker arm connections for operating the exhaust valve, it involved invention to mount the cam rod in the manner specified in the patent in suit. Hall's disclosure persuades me that the patentee was not the first to overcome the difficulty in removing the exhaust valve from its casing, and he is entitled at most to protection only for his specific embodiment; i. e., the particular valve structure and operating mechanism to which reference has hereinbefore been made.

There was testimony to carry back the Barber invention, and it was contended that both the Hall and Jerram patents were too late to be either anticipations or publications, within the meaning of section 4886 of the Patent Statute (Comp. St. 1916, § 9430). In order to constitute a bar, these patents would have to have been dated or issued more than two years before February 24, 1902, the filing date of the application for the Barber patent. Such, however, not being the fact, evidence was introduced as to the time when Barber conceived and completed his invention, with a view of carrying its date back of the dates of the claimed anticipating patents. The testimony on this point, however, does not remove a reasonable doubt in my mind as to the completion of his invention before the spring or summer of 1901. He claims that he commenced work on his invention in the fall of 1897 and that rough sketches were then made; but in the Otis Case he swore that the preliminary sketches for the valve were made in 1898, and in another case involving his patent he swore the sketches were made in 1899. They were not produced for my inspection, although it was stated that they had been before the court in the Otis Case, with

the exception of two sheets; the others being claimed to have been mislaid or stolen. The pattern maker testified, it is true, that he made patterns of the valve at Barber's request in 1898, and that later there was some machining done; but none of the three witnesses who testified as to patenting prior to the filing date state that they actually saw the valve in operation in connection with a motorcycle earlier than the spring or summer of 1901. Moreover, their testimony referred to the inlet valve construction exclusively, and not to the instrumentality for removing the exhaust valve. The Hall and Jerram patents were granted March 17, 1900, and June 12, 1900, respectively; but, as the evidence does not carry the date of Barber's invention back of either, they were properly cited to prove anticipation or the prior state of the art.

In the Otis Case there were in evidence prior patents describing push rods with tappets; but they were considered immaterial by the court, inasmuch as they did not include the combination in suit. Here, however, the proofs are that prior patents, not before the court in the Otis Case or before the Examiner of Patents, substantially embody the combination, having parts equivalent to the parts of claim 9, and therefore claim 9 is entitled to only a narrow construction. In the Hall, Jerram, and Hirsch patents the removal of the valve mechanism was somewhat different from complainant's, whose main object, as heretofore indicated, was the quick and easy removability of the valve mechanism. Claim 9 is, at most, of narrow scope and of limited application, and does not include all kinds of removable valve actuating mechanism for easily and quickly taking the valve from its casing for cleaning and repairing. Defendant's structure, an overhead inlet valve, wherein the push rod is removed from its support by the rocker arm, which actuates the valve stem and presses it downward, to permit unscrewing the valve plug, does not resemble complainant's valve mechanism, and is not, in view of prior disclosures to which reference has been made herein, an infringement of claim 9 in suit.

The bill is therefore dismissed, with costs.

---

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes