## BARBER v. OTIS MOTOR SALES CO.[*]

(Circuit Court of Appeals, Second Circuit. February 9, 1921.)

### No. 147.

1. **Patents ⟜328—781,802, for gas engine valves, void for anticipation.**

   The Barber patent, No. 781,802, for valves and valve gear for explosive engines, claims 8 and 9, covering inlet and exhaust valves so constructed as to be readily removable for cleaning and repair, which is the sole purpose of the invention, *held* void for anticipation.

2. **Patents ⟜66—Imperfect device may anticipate.**

   If the mechanism made under a prior art patent is capable of producing, or is designed, adapted, or is used to produce, the same results or perform the same function, it may be an anticipation, though it is imperfect.

3. **Patents ⟜73—Proof to carry back date of invention must be beyond reasonable doubt.**

   One who seeks to carry the date of invention back of the date of an anticipating patent assumes the burden of proof, and must establish the earlier date by evidence so cogent as to leave no reasonable doubt.

4. **Words and phrases—"Internal combustion engine."**

   An "internal combustion engine" is one in which the fuel charge, consisting of a combustible gaseous mixture, is ignited and exploded inside of the engine; the sudden explosion of the gases producing the combustion serving to force down the piston in the cylinder, thereby imparting motion to a crank shaft or other part.

Appeal from the District Court of the United States for the Northern District of New York.

Suit in equity by William Barber against the Otis Motor Sales Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 265 Fed. 675.

Jeffery, Kimball & Eggleston, of New York City (Robert D. Eggleston, of New York City, of counsel), for appellant.

Samuel E. Darby, of New York City, and Fred Francis Weiss, of Brooklyn, N. Y., for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 535, 65 L. Ed. —.

MANTON, Circuit Judge. Letters patent No. 781,802 were applied for on February 24, 1902, and issued on February 7, 1905, to William Barber. The patent is for a valve and valve gear for explo- sive engines. This suit was commenced in May, 1915, in the Northern District of New York. After final hearing, a decree was entered for the plaintiff, holding claims 8 and 9 of the patent in question valid and infringed. The opinion may be found in 231 Fed. 755, and this result was affirmed in 240 Fed. 723.

Shortly thereafter the plaintiff brought suit in the District Court for the Southern District of New York against the Reo Motor Car Company of New York. At the final hearing the District Judge there dismissed the bill. Barber v. Reo Motor Car Co., 245 Fed. 938. No appeal was taken from this decree. Thereafter the appellant moved in the District Court for the Northern District of New York to re- open the interlocutory decree granted herein, which was affirmed on appeal. The motion therefor was granted, the mandate of this court recalled, and a further hearing was had, after filing an amended an- swer setting forth prior art patents not called to the District Judge's attention. The District Judge adhered to his previous ruling and held claims 8 and 9 valid and infringed. It is from this interlocutory de- cree so entered that the appellant appeals.

[1] There were pleaded and proved in the trial of Barber v. Reo Motor Car Co. in the Southern district of New York, prior patents which were claimed to anticipate the patent in suit. These were be- fore the District Judge at the last hearing in this action, which re- sulted in the decree appealed from. None of the prior patents now relied upon as anticipation were cited in the patent office. The purpose of the invention is described by the patentee as follows:

"The object of my invention is to provide a motor engine of the explosion vapor type of a simple and cheap form of construction, so made that the inlet and exhaust valves thereof may be quickly and easily removed from the body of the motor without disturbance of the other parts, and quickly cleaned, ad- justed, or renewed, as occasion may require, and returned to position."

The claims in suit are as follows:

8. In an explosion motor, the combination with an explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the explosive vapor inlet, of a valve seat ring provided with gas passages lo- cated in the end of the head portion of the T-passage adjacent to the explosion chamber, a puppet valve carried by the valve seat ring opening toward the ex- plosion chamber, a spring normally keeping the valve in the closed position, and a screw plug provided with a perforate peripheral wall and a closed outer and an open inner end closing the outer or air end of the head portion of the T-shape passage and holding the valve seat ring in position thereof, through the perforations in the wall of which the explosive vapor passes from the main or stem portion of the T to the valve at the open end of such plug, sub- stantially as shown and described.

9. In an explosion motor, the combination with an explosion chamber hav- ing a T-shaped gas passage the main central or stem portion of which forms the exhaust orifice of the explosion chamber of a screw plug closed at the outer end, open at the inner end, and having a perforated peripheral wall, so as to give free communication between the central hollow thereof and the main stem or central passage and the explosion chamber located in the head portion of the T-shaped passage, a puppet valve the stem of which projects

outward through the head of the plug seated upon the inner end of the plug, so as to cut off communication between the main stem portion of the T-passage and the explosion chamber, except when the same is forced away from the seat and toward the explosion chamber, a spring for normally keeping the valve in the closed position and means for forcing the valve stem inward so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof so as to permit of removal of the plug and valve by the unscrewing of the plug, substantially as shown and described.

[4] Internal combustion engines are engines in which the fuel charge, consisting of a combustible gaseous mixture, is ignited and exploded inside of the engine; the sudden explosion of the gases producing the combustion serving to force down the piston in the cylinder, which imparts motion to a crank shaft or other part. The operation in such engine is that the inlet valve opens in, and the quantity of gaseous mixture is sucked into, the explosion chamber through the inlet valve upon the downward stroke of the piston, and the mixture is then compressed by the upward stroke of the piston, and at the top of the stroke the compressed gas is exploded by an electric spark or other form of ignitor, thereby forcing the piston down, this being the power stroke, and the exhaust valve is opened at the end of this stroke, and the exhaust gases—that is, the products of the combustion—are expelled through the exhaust valve and exhaust pipe into the atmosphere by the upward stroke of the piston. The inlet valve again opens, a new charge of fuel gases enters the combustion chamber on the next downward stroke, and the cycle of operation is repeated. Such engines have an inlet valve and an exhaust valve, which must open or be opened at proper times for the admission of the fuel gas to the engine and for the discharge of the exploded gases from the engine.

The explosions in such engines are very rapid—from 50 to 500 or more per minute—depending upon their speed, and this results in the exhaust valves being subject to a very high temperature, making them likely to warp, and causing soot or carbon to adhere to the valves and valve seats, which require occasional cleaning or repair. This condition has always existed in this class of engines, and provisions have always been made for the removal of such valves. But the appellee's invention concerns the facilities for the valve removal. It is the ease of removability of the valves that was the sole object of the patentee. The invention does not in any way improve the functioning or operation of the engine. Nor does it improve its efficiency. It purports to cover an automatic inlet valve—that is, an inlet valve operated by the suction of the engine and not by mechanical means—and an exhaust valve with a means for mechanically operating it. There is no patentable relation of each to the other, and the claims we shall treat separately.

Valves are designed for removal usually in two ways: First, with the valve seated directly against the inside of a cylinder casting, the valve is of necessity larger than the irremovable valve opening which it closes, and cannot be removed through that opening, but has to be withdrawn from the inside, which necessitates taking down the cylinders. Second, where the valve is seated against a removable valve

seat, so that the valve and valve seat can, at the same time, be withdrawn outwardly. This latter construction is known in the art as a valve cage. The valve cage type has two principal designs, which differ as to the method of screwing the cage to the engine: First, the screwed bolt design, in which the valve cage is held in place by two or more screw bolts; and, second, the screw plug design, in which the cage itself is screw-threaded, so that it can be screwed directly into the cylinder casting. Both designs are identical in function and efficiency. It is the latter design which is covered by claim 8 of the appellant's invention. The screw plug design, as we shall refer to later, was known to the art at the time of the appellee's invention.

It is essential that the inlet and exhaust valve open and close at the proper time to make the engine function. For most inlet valves and all exhaust valves, mechanical means for opening them have been employed in the past, and the mechanical means employed have been a cam shaft in connection with a rod, called a push rod or rocker arm, actuated at one end by the cam shaft and at the other end actuating the valve stem, so as to open the valve. No matter whether such valves were operated by suction or mechanically, it was necessary to remove them from time to time for cleaning or repairing. The appellee's inlet valve structure consists of a bushing containing the inlet pipe, which is screwed into the top of the cylinder casting and locked into position by a lock nut. A valve seat ring, carrying the valve with valve stem expanding upward, is inserted by hand into this bushing in the cylinder cavity. To hold the valve seat ring in position and to close the opening of the outside, a screw-thread plug, having a perforated wall, is screwed into the bushing, thereby forming an inclosed chamber, into and through which the gas would flow from the inlet pipe into the combustion chamber when the valve is pulled down by the suction from the engine cylinder. By unscrewing the screw plug, the valve seat ring carrying the valve may be readily lifted out for cleaning or repairing. The valve itself is a common type of poppet valve in closed position by a spring and operates as valves of this type do.

The value of the combination is that, by unscrewing the screw plug, the valve may be removed for cleaning and repairing. Because it is actuated by suction, and not mechanically, it can easily be removed. The structure is known in the art as a screw plug valve cage, and it is in two pieces, instead of in one piece, and is operated by suction, instead of mechanically. Referring to the language of claim 8, it appears that the valve, which is removable, is—

"In an explosion motor, the combination with

"(1) An explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the explosive inlet, of

"(2) A valve seat ring provided with gas passages located in the end of the head portion of the T-passage adjacent to the explosion chamber,

"(3) A puppet valve carried by the valve seat ring opening toward the explosion chamber,

"(4) A spring normally keeping the valve in the closed position and

"(5) A screw plug provided with a perforate peripheral wall and a closed outer and an open inner end closing the outer or air end of the head portion of the T-shape passage and holding the valve seat ring in position thereof,

through the perforations in the wall of which the explosive vapor passes from the main or stem portion of the T to the valve at the open end of each plug, substantially as shown and described."

Examining the prior art patents, which the appellant contends are sufficient to defeat this claim, we find sufficient to support the contention of the appellant. We think that the patent to Wolgrath (French, British, and Swiss patents of 1899 and. 1900) anticipated the appellee. There the inlet valve assembled is the same as the appellee's, both functionally and structurally. The Wolgrath valve is operated by suction, and his structure is in two parts, a valve seat ring carrying the valve, and the screw plug to hold the valve seat ring in position. The ring has gas passages. It carried a poppet valve normally held in closed position by a spring. The screw plug has a perforated peripheral wall to permit passage of the gas from the inlet pipe through the cage into the explosion chamber. There is a T-shape gas passage, as in the appellee's structure; that is, the inlet pipe forms the stem of the T, and the valve structure forms the head of the T, and the testimony of the appellant's expert is to the effect that the two are structurally and functionally identical. It was issued May 3, 1900, a year and nine months prior to the appellee's application. The appellee, however, contends that his date of invention would support his claim that this patent does not anticipate. We shall deal with that question later, as the same answer is made to several of the prior art patents which we will here consider.

Another British patent was issued to Bousfield on February 10, 1900, and applied for March 9, 1899. This was the type of screw plug valve cage inlet valve structure. The appellant's expert says it is identical with the inlet valve of the appellant. There is no contradiction of this testimony. Indeed, the appellee's expert testified:

"By Mr. Eggleston: Q. Is there any other element you do not find in the Bousfield patent? A. I think not.

"Q. So you find every element except the spring for normally keeping the valve in a closed position? A. I think I find all the other mechanical elements described. The spring is there, and that is what it is for; but I would not say that that is what it does or would do.

"Q. But you do find a spring, and the function of the spring is intended to keep the valve in a closed position? A. I do find a spring, and have no doubt but what that spring is intended for that.

"Q. And there is no question but what it operated, but how long you are unable to say? A. Exactly."

Unless the appellee has satisfactorily established his date of invention as prior to the grant of this patent, it is a bar here.

The patent granted to Fessard (1899 patent) was issued two years prior to appellee's application. The drawing shows screw threads at the bottom of the plug, and we do not think that it was of a flanged type of screw cage, as held by the District Judge below. The experts called by both appellant and appellee say that it was a screw plug valve cage, and not a screw bolt valve. It was therefore a complete anticipation of this claim.

In addition thereto, there is the patent to Hirsh of 1895, which was of the same type and contained each element of the combination of

claim 8. The Fessard, Bousfield, and Hirsh patents, and the Beaumont publications (published by Lippincott in 1900, preface dated March, 1900), are sufficient, in our opinion to constitute a complete anticipation of this claim. As we shall point out later, we do not think that the appellee has successfully carried back his date of invention.

Claim 9 covers appellee's exhaust valve structure and operating mechanism. Exhaust valves are not operated automatically by the suction of the engine, but mechanical means for opening them are necessary. The means employed by the patentee consist of a push rod actuated by a cam, which push rod has a right-angle extension and is so mounted that the extension is normally held by a set screw under the valve stem, so as to lift the valve when the cam lifts the push rod. By removing the set screw, the extension to the push rod may be rotated away from the valve stem and the valve cage removed. The novelty which is covered by the combination of claim 9 is the push rod having a right-angle extension, mounted so as to be rotatable away from underneath the valve stem, in order that the valve cage may occasionally be unscrewed and removed for cleaning and repairing. It is claimed that there is no infringement, because appellant's inlet valve structure and operating mechanism follow the prior art, and not the appellee's patent, and that the claim covers and is expressly limited to an exhaust valve structure, whereas the infringing structure is, in fact, an inlet valve structure. Reading the claim, it will be observed that it covers:

"In an explosion motor, the combination with

"(1) An explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the exhaust orifice of the explosion chamber of

"(2) A screw plug closed at the outer end, open at the inner end, and having a perforated peripheral wall, so as to give free communication between the central hollow thereof and the main stem or central passage and the explosion chamber, located in the head portion of the T-shaped passage,

"(3) A puppet valve the stem of which projects outward through the head of the plug seated upon the inner end of the plug, so as to cut off communication between the main stem portion of the T-passage and the explosion chamber, except when the same is forced away from the seat and toward the explosion chamber,

"(4) A spring for normally keeping the valve in the closed position and

"(5) Means for forcing the valve stem inward so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof so as to permit of removal of the plug and valve by the unscrewing of the plug, substantially as shown and described."

The first four elements of this claim cover a screw plug valve cage which we have above dealt with. The fifth element is claimed to cover any means for operating the valve, so mounted as to permit of the ready and easy removal of the valve cage. It is not claimed for this combination that it relates in any way to improve the functioning or operation of the engine, but is solely directed to the object of facilitating the removal of the valves for cleaning and repair purposes. We think that this claim was anticipated by prior patents.

In the Hirsh patent, No. 532,555 of 1895, the inventor stated that his invention is directed to the valves and valve-operating mechanism.

of internal combustion engines, and that his improvement is especially applicable to engines where minimum of space and concentration of power are desirable. We think the patentee Hirsh shows the fifth element of claim 9 as above stated in saying:

"Means for forcing the valve stem inward so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof so as to permit of removal of the plug and valve by the unscrewing of the plug."

Hirsh provides for a rocker lever pivot on a fulcrum pin on a bracket which is fastened to the frame of the engine. The end of the rocker is operated by an ordinary double grooved cam; the other or lower end contacts with the valve stem, forcing the valve stem inward, so as to open the valve. This lower end of the rocker lever is joined to this body part, so that the lower part, or valve-operating end of the lever, may be swung laterally away from the valve stem. In ordinary running, the lower end is held in normal operating position over the valve stem by the flat spring. By pressing with the hand the lower part of the rocker lever sidewise against the spring, so that it will assume the position shown by the dotted lines in Figure 19, the screw plug carrying the valve may be readily unscrewed and removed. It thus appears that the Hirsh valve-operating means is adapted to be removed from contact with the valve stem without removal from the support thereof, so as to permit of removal of the plug and valve by the unscrewing of the plug.

It is contended, however, by the appellee, that Hirsh's engine is not a gas engine; but it is clear that in the Hirsh engine, as in every type of internal combustion or explosive engine, an exhaust valve is necessary to permit the exploded gases to leave the combustion chambers. Hirsh's engine is an explosive engine, and the exhaust valve structure and operating mechanism performs the same function in exactly the same way as in appellee's engine. It is further contended that the contour of Hirsh's cam, as shown in the patent drawing, is not sufficiently accurate to open and close the valve at exactly the proper time; but Hirsh, in his specification, says that his cam is so timed as to produce the proper operation of the parts. Hirsh's is a double grooved cam and apparently well known in the art.

[2] Assuming that there are imperfections in Hirsh's mechanism, that would not defeat what is claimed for it by the appellant. Pickering v. McCollough, 104 U. S. 310, 26 L. Ed. 749; Westinghouse Air Brake Co. v. Christensen Engineering Co., 128 Fed. 437, 63 C. C. A. 179. If the mechanism made under the prior art patent is capable of producing the same results, or is designed, adapted, or used to produce the same results or perform the same function, it may be successfully set up as an anticipation. Loom Co. v. Higgings, 105 U. S. 580, 26 L. Ed. 1177; Consolidated Co. v. Met. Brewing Co., 60 Fed. 93: Mosler v. Lurie, 209 Fed. 364, 126 C. C. A. 290.

The British patent to Hall of 1899 was for improvements in motors for propulsion of vehicles. There is described and shown in the patent a means for operating the exhaust valve, so mounted as to permit

the ready and easy removal of the valve. Figure 6 shows "a means of forcing the valve stem inward so as to open the valve actuated by the motor," and the cam rod which is used is mounted in a sleeve or casing which is so pivoted that by loosening the nut or screw it, together with the cam rod, may be swung out of operative position and away from the valve stem. The patentee says as to the purpose of this construction:

"This enables me, by slacking out one or two screws, to swivel this cam rod out of position and withdraw the exhaust and gas valves without interfering with any other parts, and saves me from taking it out of gear or time with the crank shaft."

"The engine also has an improved arrangement of exhaust governor gear by which the exhaust and gas valve may be taken out without interfering with any other parts, or without having to throw the said gear out of time with the crank shaft."

While the Hall specification does not in so many words describe the exhaust valve and mechanism with particularity, it appears from the testimony that the drawing accompanying the patent indicates its form and character. One skilled in the art would have no difficulty, at the time that the appellee applied for his patent, in understanding from the Hall specifications the broad embodiment of the combination in suit.

The British patent to Jerram of March 31, 1900, is for an improvement in gas, oil, and light motors, and is directed to the valves and their operating mechanism, express mention being made of the removability of the valves. The valve assemblage shown in the cross-section, Figs. 3 and 4, is the type of screw plug valve cage, with poppet valve spring perforated peripheral wall, with screw threads at the bottom, and there is the T-shaped gas passage. An examination of the drawings shows that the valve plugs have no flanges, contrary to the appellee's contention, and are of such shape that they could not be held by the screw bolts, and are necessarily screw-threaded, so as to be screwed into the cylinder casting. The inventor in his description says:

"Means for forcing the valve stem inward so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof, so as to permit of removal of the plug and valve by the unscrewing of the plug."

To move any one or more of the valves, it is simply necessary to turn the handle upward, thereby removing the disks, which movement swings the rock levers upward and away from the valve stems. The valve plug may then be unscrewed and removed, and the patentee says:

"The levers (11,11,11,11,12,12) swing on the spindle (13), having on each end eccentric portions (14,14); one has a handle attached to enable the levers to be bodily swung out of the way to allow the withdrawal of the valve boxes (V, V, X, X) for cleaning purposes."

We think the Jerram patent anticipates the appellee's invention.

[3] Unless it can be said that the appellee has successfully fixed the date of invention antedating these patents of the prior art, we are forced to the conclusion that the patent in suit has been anticipated thereby; that is, he must establish his date of invention antedating the patents to Bousfield (British) applied for March 9, 1899, accepted Jan-

uary 20, 1900, printed copies on sale February 10, 1900, issued April 3, 1900; the Hall (British) patent, February 25, 1899, accepted February 24, 1900, printed copies on sale March 17, 1900, issued May 8, 1900; Jerram, applied for February 26, 1900, accepted March 31, 1900, printed copies on sale April 20, 1900, and issued June 12, 1900; Wohlgrath (French) applied for January 17, 1900, issued May 3, 1900.

At the time of the trial of Barber v. Reo in the District Court for the Southern District of New York, and upon the rehearing granted in this trial, the appellee endeavored to establish his date of invention so as to avoid the patents above referred to. But the testimony is unsatisfactory. It will be observed that the four anticipating patents were issued nearly two years prior to appellee's application, and printed copies of the Bousfield were made and on sale in the British Patent Office more than two years prior to appellee's publication. The appellee testified that he made his preliminary sketches in 1897. It appears that he testified on another trial that he made his preliminary sketches in 1899, and upon the first hearing in the case at bar he testified that he commenced designing and developing the motor engine of his patent the last part of 1898 and the beginning of 1899. He says he made rough sketches and kept them, and that he did this work in a shop at Coney Island avenue and the Boulevard, Brooklyn, N. Y., and before he had a shop at 224 State street. However, on the first hearing, he testified that the shop on State street is the place which he had prior to the invention of his motor. He gave no satisfactory excuse for his former testimony. He has given inconsistent testimony as to matters which he uses for fixing the dates, such as when he occupied or vacated several shops he had, the birth of his child, inventions as to muffler and spark plug, and the collapsible running gear for which he filed applications for patents. Finally, he stated that his memory for dates and numbers was not very good. He gave poverty as a reason for not filing his application for his patent until 1902, when at one time he declares the invention thought came to him in 1897. But it appears from his own testimony that he was engaged in business and owned a factory in 1900.

His wife testified to making an entry in their family Bible of the birth of a child, and thus fixing the date when she saw her husband making drawings; but it is apparent that the appellee was interested in other patents. She did not identify the drawings, and says that her husband was constantly making drawings of different devices, and had been doing so for a period of eight years. She could not fix a date as to when he made drawings of various inventions which he was interested in. The testimony of the pattern maker does not aid the appellee, nor did that of the iron moulder. Both were confused as to their dates.

We find no testimony from any of the witnesses called on behalf of the appellee which satisfactorily demonstrates that the appellee had in mind and was working upon the combination of mechanical elements which are embraced within claim 9 of the patent in suit, nor is it satisfactorily shown that at the time now claimed by the appellee as the date when he devised the patent in suit he was engaged in pre-

liminary work or drawings thereof. There is no such testimony as would tend to bear the burden of establishing that the appellee at such date was engaged in the work of securing instrumentality for removing the exhaust valve.

One who seeks to carry the date of invention back of a date of an anticipating patent assumes the burden of proof, and must establish the earlier date by evidence so cogent as to leave no reasonable doubt in the minds of the court that the transaction occurred substantially as stated. Moline Rock Plow Co. v. Rock Island Plow Co., 212 Fed. 727, 129 C. C. A. 337. The rule as to the burden cast upon the appellee in endeavoring to fix such a date is very strict. It is so easy to fabricate or color evidence of prior invention, and so difficult to contradict it, that proof has been required which does not admit of reasonable doubt. Thayer v. Hart (C. C.) 20 Fed. 693. In Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521, it was said:

"A conception of the mind is not an invention until represented in some physical form."

We think that the credible evidence in the case warrants the conclusion that the appellee's valves were not complete until some time subsequent to the summer of 1900, and that the appellee's invention is anticipated by the patents of the prior art above referred to.

The decree is reversed.