## WESTERN STATES MACH. CO. v. S. S. HEPWORTH CO.

### No. 85.

Circuit Court of Appeals, Second Circuit.

Jan. 16, 1945.

---

Albert C. Johnston, and Hammond & Littell, all of New York City (Nelson Littell, of New York City, on the brief), for plaintiff.

W. F. Sonnekalb, Jr., and Howson & Howson, all of New York City (Charles H. Howson, of New York City, of counsel), for defendant.

Before L. HAND, CHASE and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

Both parties appeal from a judgment in an action for the infringement of four patents. (In the District Court five were involved, but no appeal has been taken as to one, and we disregard it.) Three were issued to the plaintiff, as assignee of Eugene Roberts: The first No. 1,758,901, on May 13, 1930, upon an application filed December 8, 1925. Claims 1, 3, 4, 5, 9 and 10 were in issue, all of which the court held valid and infringed. The defendant appealed. The second, No. 1,861,978, was granted on June 7, 1932, upon an application filed April 23, 1929. Only claim 3 was in issue, and the court dismissed the complaint for noninfringement. The plaintiff appealed. The third, No. 2,145,633, was granted on January 31, 1939, upon application filed June 23, 1934. Claims 10 and 12 were in issue, and the court held both valid and infringed. Defendant appealed. The fourth, No. 2,096,341, was issued to Roberts, personally, on October 19, 1937, upon application, filed November 30, 1934. Claims 3, 6, 7, 8 and 9 were in issue. The court held claim 9 valid and infringed, and claims 3, 6, 7 and 8 invalid. Each party appealed. All four patents related to improvements in sugar centrifuges. The process of extracting sugar from molasses, which is all done in a centrifuge, is in three phases: "purging," separating the sugar crystals from the "green syrup"; "washing," cleaning out the remains of the molasses; "drying," letting the sugar crust harden. The District Court in its opinion described the plaintiff's patents, and the infringing machines in such detail that we may refer to it for the facts, except in so far as may be necessary for our own discussion. Western States Machine Co. v. S. S. Hepworth Co., D.C., 51 F.Supp. 859. We shall speak of the four patents as follows: (1) the "Control Patent"; (2) the "Lever Patent"; (3) the "Separator Patent"; (4) the "Brake Cooling Patent."

### The "Control Patent"

The sequence of operations involved in a sugar centrifuge was confessedly old. Molasses is poured into a cylindrical basket with holes in its upright sides, which is then rotated at high velocities. Under the centrifugal force so generated, the molasses wells up on the inside of the basket through the holes in which the "green syrup" passes and drains off, leaving a crust of sugar crystals, adhering to the inside. This phase must not continue too long, else residual molasses, which remains in the sugar crystals, will harden and be held. To get it out, water is sprayed upon the inner surface of the crust, and passes out through the holes, like the "green syrup." This phase also must not go on too long,

or to much of the sugar will be melted and run off with the water. Finally, after the spray has been stopped, the basket must continue to rotate to drive away vestigial water. This phase also must not go on too long, else the crust will harden too much, and will be difficult to "plow" off, which is done at a very much reduced speed. On the other hand, each of these phases must be continued long enough. It is not possible to set the same period for the same phase in every batch treated, because molasses varies in viscosity; it requires a skilled workman to know what time to allow for each phase in any given batch. Such a workman can, however, by a single inspection, set the period of each phase for any given batch, and an automatic machine set for the proper periods may be left to do its work alone. This Roberts's machine itself, and we shall accept for argument as the date of his invention, December, 1923—that being the date fixed by the District Judge. Claim 1—after enumerating the well-known elements of a centrifuge, and prescribing that the sprayer shall be "automatically timed"—described a "timing means," which should start the sprayer at a fixed period after the basket started, and should stop the basket at a fixed period after the sprayer had stopped. Claim 3 was for setting the brake after a fixed period, and restoring the timer after the basket had stopped. Claim 4 was in general terms for "regulating the duration of the successive purging spraying and drying." Claim 5 was for a timer to start and stop the sprayer, and then to set the "self-setting brake," all at predetermined, variable, intervals. Claims 9 and 10 were variants, not necessary to describe. None of these claims descended into particulars; if read as written, they covered any centrifuges which would start the sprayer at the proper interval after the basket began to rotate, would stop it when the sprayer had sprayed long enough, would brake the basket after the proper drying period had passed, and would reset the timer. If it was an invention to take the old centrifuges and make them automatic throughout: that is, if it was an invention to conceive of making them automatic, and to disclose a machine which would do so, the judgment was right, for in the supposed infringements all three phases are automatically regulated.

█ We would hesitate to hold, even though the art had not taken a single step towards an automatic centrifuge, that the mere conception, though followed by the disclosure of an example, could support a monopoly of all future machines, which were similarly automatic. However, "invention" is so elusive a word that, if nothing had stood in the way of fabricating such a machine, if the art had waited long for one, and if, when it appeared, it had superseded all that had gone before; if all these facts conspired, we will not say that they might not have overcome our hesitation. French v. Buckeye Iron & Brass Works, 6 Cir., 10 F.2d 257, 261. As we have often repeated, in judging what requires uncommon ingenuity, the best standard is what common ingenuity has failed for long to contrive under the same incentive. In the case at bar, however, the art had already made a centrifuge, automatic in all but the last phase: i.e., stopping the basket at the end of the drying period. This appeared in the patent to Carlson, No. 1,669,927, granted on May 15, 1928, upon an application filed July 20, 1922: for a centrifuge "to provide efficient means * * * by which the sugar will be washed for a certain predetermined period of time and at a predetermined interval in the operation of the centrifugal machine; said action being carried on automatically and without control of, the operator." (p. 1, lines 18–25.) Carlson did this by an automatic timer which opened a control valve of the sprayer after the centrifuge had been running for a fixed period, and allowed it to close after it had sprayed for a second fixed period. The timers were set in motion by electromagnets—the first one beginning to run when the basket started to rotate; and the second, by the closing of a switch when the sprayer started.

██ To this patent the plaintiff makes two answers: (1) That the disclosure was inoperable; and (2) that, since the patent was not granted until after Roberts's date of invention, it did not invalidate his claims. The first need not detain us long. It is true that there was a mistake in the wiring diagram, but the defendant's expert, who alone testified on the matter, called it a "draftsman's error" to be "simply corrected by interchanging two wires." If two wires were "just swapped, then the circuit is completely rectified of the difficulty mentioned." The judge did not find that the disclosure was inoperative; and in the face of this undisputed testimony there would have been no support for such

a finding. Besides, all patents are presumed to be operative when they pass the examiners, and there must be substantial proof that they are not, if they are to be disregarded. Dashiell v. Grosvenor, 162 U.S. 425, 431, 432, 16 S.Ct. 805, 40 L.Ed. 1025; Crown Cork & Seal Co. v. Aluminum Stopper Co., 4 Cir., 108 F. 845, 849; Troy Laundry Machinery Co. v. Columbia Mfg. Co., D.C., 217 F. 787, 789; Scovill Mfg. Co. v. Satler, D.C., 21 F.2d 630, 634. The same holds true of the strictures upon the Hull and Hall patents, the timing devices of which were in substance incorporated in Carlson's patent. The judge suggested, as we understand it, that Carlson's patent was not relevant, because it was not part of the prior art when Roberts conceived his invention. In this it seems to us that he did not give proper weight to the revolutionary decision of the Supreme Court in Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Nor can we agree that, except in mere form, it is incorrect to call an application, still in the Patent Office, "prior art," as the court did in Detrola Corporation v. Hazeltine Corporation, 313 U.S. 259, 265, 61 S.Ct. 948, 85 L.Ed. 1319; because in effect that is just what it is, as we shall try to show.

When Alexander Milburn Co. v. Davis-Bournonville Co., supra (270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651), was in the District Court, I attempted to make a distinction between "prior art" and "earlier invention" (297 F. 846, 851-854). Once a disclosure has been published, I admitted, it ends all power to secure a patent upon any combination which can be made of the elements disclosed, no matter how authentic and outstanding an act of invention it may demand to conceive of that combination. There may be an indefinite number of "inventions" in the possible permutations of those elements, but they all fall into the public demesne. On the other hand, when the issue is of prior invention, I argued, an earlier application which is to invalidate a later one must show that the "prior inventor" had disclosed, not only the elements out of which the second inventor composed his new combination, but the combination itself. In short, priority between inventions depends upon priority between the acts of selection which constitute invention. It followed that, on the issue of prior invention, a comparison of claims must always be the test; allowing some latitude beyond

their letter, just as is allowed upon a reissue. Since, in the case then at bar, the claims in the earlier application were—even when given a wide latitude—different from the claims of the patent in suit, I held the patent valid. This I understand to have been in substance also the ruling of this court. 1 F.2d 227. But the Supreme Court said no: it saw no practical distinction between a publication which confessedly, for purposes of patenting, invalidated all permutations that could be drawn from the congeries of elements disclosed, and an application which disclosed those elements, if it finally came out as a patent. In either case, the public profited by the publication, and the first inventor, who assembled the elements, put an end to any further profitable exercise of ingenuity upon them, although they were not yet in the public demesne. That, as we understand it, obliterated the distinction between the issue of prior publication and prior invention, and makes it proper to speak of a prior application as "prior art."

It might still be plausible, however, to argue that there remained another distinction between a prior application and a prior publication. A prior publication—although it may not completely anticipate a later application—nevertheless, if it discloses enough to make easy and obvious the step taken from it to a later application, will defeat the application. On the other hand—this argument would run—since a prior application is not part of the known art when the later application is filed—or when the "invention" is conceived which it embodies—and since the question is always who was in fact the first to invent that invention, no application will serve to invalidate the later invention except one that contains in its disclosure all that is in the later application. This—the argument would conclude—does not trench upon the doctrine that the prior application need not disclose that combination of the disclosed elements which the later inventor has perceived. It leaves that doctrine intact, but it does insist that the prior application must disclose all the elements of which the later invention is composed. When the issue is of prior invention, as opposed to publication, the office of the earlier application would therefore be exhausted, it could not be used merely as an encroachment upon the field which the later invention occupied, even although it left unoccupied too little to support a patent. It is of course possible

to reason in this way, but it appears to us to involve the same presupposition which the Supreme Court overruled in Alexander Milburn Co. v. Davis-Bournonville Co., supra (270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651). That decision—as we understand it—meant to disregard the fact that an earlier application did not at the moment enrich the art; it proceeded upon the asumption—perhaps not fully expressed, but implied—that since its disclosure would eventually fall into the public demesne quite as much as though it were presently published, the interval during which it remained secret should be disregarded. True, that was not necessary for the protection of the first inventor, who needed only that his own claims should be valid; but, once the first application is treated as prior art when it fully anticipates, there seems to be no reason to deny it whatever effect it would have as prior art, if it were literally such.

■ It follows from what we have said that Carlson's patent left nothing on which Roberts could rely, except the fact that Roberts carried automaticity beyond the "purging" and spraying periods, and included the drying period. Particularly, when we consider that Roberts took this step only a year after Carlson filed his application, there would be no warrant for allowing it to be the basis of a patent. This does not mean that we must hold the claims invalid for all purposes. When a patentee has disclosed a meritorious invention, but has claimed it too broadly, he is not always forced to a reissue; courts will at times read into the broad language limitations drawn from the specifications, which save the claims as they stand. McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800; Fowler & Wolfe Mfg. Co. v. McCrum-Howell Co., 2 Cir., 215 F. 905, 909; Radio Corporation v. Twentieth Century Radio Corporation, 2 Cir., 19 F.2d 290, 293; R. M. Hollingshead Co. v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 546. All claims are to some extent more general than the specifications, and all must be read upon them. In the case at bar, we do not hold that the claims in suit cannot be circumscribed to the timing devices as they were disclosed, or that their generality invalidates them. But we do hold that, whatever latitude remains to them,when so circumscribed, they will not cover the defendant's apparatus. The only invention, which can support them at all lies in the specific timing system, together with its accompanying train of mechanical elements. To that the defendant owes nothing; its whole system has a totally different structure and a totally different provenience. We need not therefore consider the Andrews & Neumann patent, or any of the other references; although we do not wish to be understood as holding that they too may not be a sufficient answer. The judgment will be reversed as to the "Control Patent," and the complaint dismissed upon the ground that the defendant does not infringe.

### The "Lever Patent"

■ That part of the disclosure of this patent which claims three covers was avowedly to correct defects in the "Control Patent" and its successor, not in issue upon this appeal. As such, it is wedded to the details of the disclosure of those patents, and what we have said in discussing the "Control Patent" applies a fortiori. The plaintiff in vain seeks to assimilate the button, PB 2, of the Georgia apparatus and the button, PB, of the Igualdad apparatus to a lever. There is no room for such a range of equivalents in so narrow a patent; no apparatus could infringe which was not made in substantial accord with the outlines of the "Control Patent." The mere idea of avoiding a violent reverse stroke of a single lever at the moment when the brake is set, was not patentable. The judgment is affirmed.

### The "Separator Patent"

■ Figure four of the patent to Holland—No. 703,728—granted July 1, 1902, and the descriptive text of the disclosure (page 1, lines 93-104; page 2, lines 1-3), are a complete anticipation of the "Separator Patent." The examiner did not find the reference; we cannot believe that, if he had, claims 10 and 12 would have survived its discovery. The parallel is so complete that the plaintiff is forced to the not uncommon expedient in such emergencies: it assails the operability of the disclosure, and its sufficiency. It has not made good either attack. The first rests upon the testimony of its own chief engineer, which in the end came to no more than that Holland's movable disk, which must rise and fall, would be apt to shift in one direction or the other, allowing the liquid intended for one compartment to enter the other. He testified that "it requires exact machining of the deflector on two faces and exact machining of the plate itself; and a plate of this design will warp after it is

machined." Again, there would be "leaks of the outer seam if the plate is not true to the seat." The conclusion that this made the disclosure inoperative we cannot accept. The judge in his opinion—though not in his findings—thought that the disclosure was not adequate to keep the "green syrup" always separate from the "wash water," following the argument of this witness. He also thought that Holland did not show any "annular ridge projecting inwardly from the curb." It may be that, as disclosed, the "flange, B¹, that has an interior shoulder upon which the cylindrical body portion A of the casing is seated" (p. 1, lines .45-47), was not adequate to insure complete separation, but a prior patent need not be perfect in order to anticipate; defects which can be corrected by ordinary skill will not destroy it as a reference. Pickering v. McCullough, 104 U.S. 310, 319, 26 L.Ed. 749; Smith v. Hall, 301 U.S. 216, 232, 57 S.Ct. 711, 81 L.Ed. 1049; Barber v. Otis Motor Sales Co., 2 Cir., 271 F. 171, 177. There is not the slightest reason to suppose that if on trial leakages did occur, their correction would not have been apparent; and certainly there was no evidence that it would not have been. The other objection is that no method is shown of raising and lowering the plate. This the specifications themselves acknowledged: "as shown in the modification Fig. 4, the collecting plate, f², is adapted to be raised or lowered by any suitable means (not shown)" (page 1, lines 93-95). When the examiner passed the disclosure, he must have agreed that it was unnecessary to show the "suitable means"; and there is no reason to think that he was wrong. Those decisions which we have already cited to show that a patent is presumed to be operable, apply also to the sufficiency of the disclosure to advise the art.

The final suggestion is that the lapse of time—over twenty-one years—between the appearance of Holland's patent and Roberts's date of conception shows that Holland made no impression upon the art. Apparently it did not, but that is irrelevant. True, when courts wish to discredit a reference, and do not quite know how to avoid it, they at times are fond of calling it a "paper patent"; but that is only rhetoric. The doctrine of "lost art" does not apply to earlier patents, as it does to prior uses. Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504. A patent may have lain for years unheeded, as little a contribution to the sum of knowledge as though it had never existed, an idle gesture long since drifted into oblivion. Nevertheless, it will be as effective to invalidate a new patent, as though it had entered into the very life blood of the industry. Pickering v. McCullough, supra, (104 U.S. 310, 26 L.Ed. 749); Ironclad Mfg. Co. v. Dairymen's Mfg. Co., 2 Cir., 143 F. 512, 515; E. J. Brooks Co. v. Klein, 3 Cir., 114 F.2d 955, 957; Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 128 F.2d 380, 385. Perhaps this should not be so; perhaps there should be some equivalent of a "lost art," which would put even prior patents in Limbo, when they have really gone to the place of departed spirits. That is another question: it is not for courts. It is true that, when so old a patent is brought forward as an anticipation, we scrutinize it jealously to make sure that the patent in suit has not moved a step further along, and whether the step taken may not have made the difference between success and failure; for the lapse of time may often be strong evidence that the change was not as simple as it looks. But there was nothing of the sort here; given the sufficiency of the specifications, and the inevitableness of any necessary corrections, Holland was as complete an anticipation of claims 10 and 12 as can be imagined. Indeed, the very argument based upon the lapse of time loses its force, in proportion as it appears that the earlier reference is unknown. The judgment will be reversed and the complaint will be dismissed as to these claims for invalidity.

## The "Brake Cooling Patent"

The judge was clearly right in holding claims 3, 6 and 7 invalid, because the "Baltimore Use" had anticipated them. They did not contain the element of stopping the water supply, automatically or otherwise when the rim stops; or the element that the trough should not spill the water left in it. When we are interpreting a series of claims, a limitation not present in one must not be implied, when the same limitation appears in later claims in the series. Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045; Cadillac Motor Co. v. Austin, 6 Cir., 225 F. 983, 986; Electric Machinery Mfg. Co. v. General Electric Co., 2 Cir., 88 F.2d 11, 16; Chamberlin Metal Weather Strip Co. v. Barringer, 6 Cir., 105 F.2d 880, 882; Van Heusen Products v. Earl & Wilson, D.C., 300 F. 922, 926. On the other hand, claim 8 does have

the element that the trough shall not spill when the rim is at rest, and in that respect the "Baltimore Use" did not anticipate it, for the trough there did empty, or at least would do so if the rim were long enough at rest. However, there could be no invention in such a change as that; indeed, to be of any service at all a tight trough demanded some device which should stop the water supply when the rim was at rest. As the defendant puts it, one cannot have a patent merely for "plugging up a hole." Claim 8 was either a useless variant, or it presupposed the stoppage of the supply; since the stoppage cannot be inferred because it occurs in claims 9 and 10, claim 8 is invalid.

In claim 9, however, occurs the element: "means for interrupting the operation of said liquid supplying means before the rim is brought to rest." There were no such means in the "Baltimore Use"; but the same difficulty arises on the issue of infringement, which existed in the case of the "Control Patent"; for, although the defendant has such a means, it is totally different from Roberts's. We do not mean that Roberts's is not automatic; we assume for argument that the shaft, 11, is automatically turned back when "the rim is brought to rest," so that the cam on the "cut-off valve, 28" no longer depresses the valve, 25b. We concede that it is very hard, if not impossible, to find any such mechanism in the specifications; but we make the assumption because the issue is a false one anyway; the defendant would not escape infringement by making its cut off automatic, if it otherwise infringed. The difficulty is deeper; the claim must be read generally to cover all means which cut off the water; and to generalize the claim so far, would leave nothing for invention but the bare conception of turning off the water when the rim stops. As a test of that, we are to ask ourselves how much inventive faculty it would have required to think of that improvement, if Roberts had had the "Baltimore Use" before him; not how much of that faculty it would have required to devise the means which he actually did devise to turn off the water, but just to conceive of that improvement at all. The very statement of the question in those terms seems to us to be its answer; if the doctrine of equivalents is to carry us so far, the conception must be of sweeping and pervasive originality. Claim 9 may still be valid; we do not say; but, if it is, it covers only means which stop the water supply by a measurably similar mechanical train as that shown in the specifications: the defendant's apparatuses do not infringe it.

The judgment holding claims 1, 3, 4, 5, 9 and 10 of patent No. 1,758,901, is reversed, and the complaint is dismissed as to those claims for noninfringement. The judgment as to claim 3 of patent No. 1,861,978 is affirmed. The judgment as to claims 10 and 12 of patent No. 2,145,633 is reversed, and the complaint dismissed for the invalidity of the claims. The judgment as to claims 3, 6, 7 and 8 of patent No. 2,096,341 is affirmed; and, as to claim 9 of that patent, is reversed for noninfringement. The complaint is dismissed with costs to the defendant.