**PALMER et al. v. SUN OIL CO.**
**Civ. No. 5537.**

District Court, N. D. Ohio, W. D.
May 26, 1948.

Edward Lamb, of Toledo, Ohio, for plaintiffs.

Effler, Eastman, Stichter & Smith, of Toledo, Ohio, and Frank S. Busser, of Philadelphia, Pa., for defendant.

KLOEB, District Judge.

This is an action against the defendant based on alleged infringement of the United States Letters Patent No. 2,096,289, issued to the plaintiffs October 19, 1937, upon application filed by Delos M. Palmer on March 8, 1937, on "Machine Drive Arrangement", a patent containing two claims.

A multitude of defenses are set up in the answer. They are noninfringement (Par. 3), invalidity based on prior art patents, of which defendant cites sixty-eight in its answer (Par. 5), invalidity because of prior use by persons named in the prior art patents cited, including the use by defendant at its plant at Marcus Hook, Pennsylvania, and knowledge of its use by its officers and employees named therein (Par. 6), invalidity because of public use more than two years prior to the filing of the application for the patent in suit (Par. 7), invalidity because the alleged invention of the plaintiffs was patented more than two years prior to the application for the patent in suit (Par. 8), invalidity because the alleged invention of the patent in suit involved ordinary knowledge and skill of a person familiar with the art to which the Letters Patent of the plaintiffs relate and is wholly lacking in patentable novelty (Par. 9), invalidity because the description of the alleged invention in the specifications of the Letters Patent in suit is not in full, clear, concise, and exact terms, so as to enable any person skilled in the art to make and use the same (Par. 10), invalidity because the claims of the patent in suit are so ambiguous and indefinite that their meaning and scope cannot be ascertained therefrom (Par. 12), invalidity because the invention is of no utility (Par. 14), defense on the ground of abandonment and laches by the plaintiffs (Par. 15), defense of laches and estoppel as against the application filed by Richard S. Vose, on January 27, 1936, which issued to him on August 1, 1939, as U. S. Letters Patent numbered 2,167,698, disclosing substantially the construction claimed in the patent or disclosing the defendant's construction alleged to infringe (Par. 16), and the defense that in view of the prior art the claims of the patent in suit are only susceptible to such a narrow construction that they are invalid or that the defendant's construction cannot be held to infringe (Pars. 11 and 13).

The principal defenses urged are invalidity and noninfringement.

### The Inventor and the Invention

The inventor Palmer is an electrical and mechanical engineer, having obtained a degree of B. S. in electrical engineering in 1921 from the University of Michigan, and a master's degree in physics in 1938 from the same institution. He was a college instructor in electrical engineering, assistant professor in physics and mechanical engineering and dean of engineering, the latter at the University of Toledo. He had an extended experience in industry, having worked for the Westinghouse Electrical and Manufacturing Company in designing, estimating and construction of electrical locomotives and diesel locomotives; as as-

sistant to the factory manager and as parts engineer at the Spicer Manufacturing Company; as plant engineer for the American Propeller Company; as works engineer for the Champion Spark Plug Company, and was engaged in the profession of consulting engineer since August 1, 1945.

Mr. Palmer testified that he thought of his idea while working for the Spicer Manufacturing Company in the fall of 1929. That at this time the Spicer Company used compressors which took gas from the Gas Company's line and increased its pressure for use in the burners at the plant; and it occurred to him that the electrical demand and consumption could be decreased by installing a gas engine and connecting it mechanically with one of the compressor units, to carry the mechanical load of the compressor as well as the electrical load of the induction motor and cause it to generate electricity for use in the plant. That about December, 1932, when he was connected with the University of Toledo, he made up an arrangement consisting of a DC motor connected to an induction machine, with a shaft extension on it, and a prony brake on the shaft extension of the induction machine to simulate a mechanical load, and tried it out. He testified this arrangement embodied in principle all of the essential elements of his patent. Witnesses Baxter and Wheaton testified they saw this model in 1932.

Mr. Palmer testified that about 1936, in conversation with Mr. Wenner, one of the plaintiffs, then representing the Gas Company, whom he sold on the idea, Wenner suggested that they put an installation in Gerber's Grocery on Sylvania Avenue, in Toledo, because he was "kicking about his power bills"; that the Gas Company induced the grocery company to buy an engine, and they put a shaft extension on the motor, and hooked the engine on to it to run the refrigerator compressor. This was followed by an installation at the plant of the Goon Ice Cream Company, and another installation at the Mather Spring Company. (See affidavits of Goon and Hendrickson, Defendant's Exhibit U, file wrapper, pages 19-24, and articles by Mr. Wenner describing these installations in "Refrigerating Engineering", August, 1937, pages 85, 86, 128, in "Gas", July, 1937, pages 14, 15, 16, 48, and in "Steel", August 9, 1937, pages 57 and 58, submitted to the Patent Office in support of the amended claims by counsel for the applicant, Defendant's Exhibit U, file wrapper, pages 33, et seq.) From these articles it appears that to carry out Palmer's idea it was only necessary to "hook up the gas engine to the other equipment", which would be left exactly as it was, the gas engine "merely supplementing" the existing equipment.

### Plaintiffs' Device

In practical operation, as in the only three installations made prior to the trial of this case, the plaintiffs' device is, in effect, an electric power plant, the electrical load being electric lights, electric motors, etc. connected to the alternating current supply line. The prime mover—an internal combustion gas engine—supplies power so greatly in excess, typically twice, of that required to drive the mechanical load (the refrigeration compressor in the Gerber and Goon installations and the blower in the Mather Spring installation), that the motor-generator is operated above its synchronous speed as a generator to absorb the electrical load.

As described and shown in the drawings and specifications of the patent in suit, the apparatus of the plaintiff consists of an ordinary internal combustion gas engine, a compressor, and an induction motor connected to an outside power line. In the drawing is also shown a thermally operated circuit maker which, when actuated, operates to close the electrical circuit when the temperature in the refrigerated space reaches a predetermined point, and starts the motor. The motor cranks the engine, the magnetically operated fuel valve is opened, and the engine is caused to start and operate. The engine drives the compressor and at the same time drives the motor above its synchronous speed, which then generates electrical energy, which, in turn, is used to operate the motors, lights and other electrical devices in the plant, and thus decrease the amount of current used from the outside supply line.

Defendant's expert, Mr. Hutchins, seems to have accurately described the plaintiffs'

patent as follows: "A. The Palmer patent, as I view it, consists in applying an internal combustion engine to an electrical motor, which in turn is driving a mechanical load, and for the specific purpose of generating electric power within the plant where this is being done, for the purpose of reducing the cost of electric power." (R. 92)

## Defendant's Device

The process used by the defendant, in which the alleged infringing installation is used, is known as the Houdry process, and comprises a new method of producing gasoline by a catalytic cracking process that has gone into widespread commercial use. The Vose patent, No. 2,167,698 (assigned to Houdry Process Corporation) discloses defendant's construction and operation. It is in an art remote from that to which the patent in suit relates. Its title is "Method For Regenerating Catalytic Masses". The application for this patent was filed January 17, 1936, about fourteen months before the filing of the application for patent in this case. No mention is made in its claims of the elements contained in the claims of the patent in suit, although they are shown and described in the drawings and specifications. Inasmuch as the Vose patent discloses the defendant's installation, it would negative novelty on the part of Palmer as not the first inventor, if Palmer had not carried his date of invention back of the filing date of the Vose application. Walker on Patents, Deller's Ed., Vol. 1, page 137, Sec. 26.

In the defendant's installation there are a series of catalytic cracking chambers, in each of which the following operations occur in succession:

1. Admission of oil vapors of high boiling range into the cracking chamber to effect a partial conversion of the oil to gasoline of relatively low boiling range. This involves deposition of carbon (coke) onto the catalyst.

2. Purging of the catalytic cracking chambers.

3. Burning off of the catalyst by compressed air, resulting in formation of carbon, carbon dioxide and carbon monoxide.

When one catalytic cracking chamber is "on stream" or cracking to gasoline, air under compression is flowing through another chamber, while still another chamber is being purged. Each of these three operations is thus continuous. The subjection of each catalytic cracking chamber to these successive operations and the shift of each operation from one chamber to another is controlled by a complicated automatic valve system.

It is necessary in this operation to drive the compressor at a predetermined fixed speed. If the pressure, temperature and volume of the gases driving the turbine were absolutely constant, the turbine would operate at a constant speed, but some variation in these factors occurs. In order to control the speed of the turbine, a motor-generator, connected with the main source of current supply, is geared to the turbo-compressor. If the speed of the turbo-compressor falls slightly below its desired speed, the motor-generator, functioning as a motor, will pick up a little current from the supply line and bring the turbine up to the desired speed, functioning just as in the Dean patent disclosure hereinafter referred to. If the speed of the turbine slightly exceeds its desired speed, the motor-generator, functioning as a generator, will supply a little current to the supply line and bring the turbine down to the desired speed. In that way the motor-generator acts as a speed regulator for the turbine. The deviation of the motor-generator from synchronous speed is small.

The power unit in the installation of the defendant consists of a starting motor of 200 horse power, a motor generator of 1500 horse power, having a synchronous speed of 1800 RPM, and a turbine of 6660 horse power, the speed of which, corresponding to the synchronous speed of the motor generator, is 5180 RPM. At synchronous speed the motor generator simply floats on the system. The purpose of the starting motor is to bring the turbine up to about 2000 RPM, so that the load is carried by No. 2 burner. The starting motor is then shut down and is not motoring while the cases are in operation. The No. 2 burner is used to bring the system up to 5180 RPM, the running speed of the turbine. Then the

motor generator is actuated by closing a switch, and No. 1 burner is then lit for the purpose of heating up the catalyst in the cracking cases. When the entire system is heated up to approximately 800° in the cracking cases, the plant is put "on stream", that is, the oil vapor is cut into each case at stated intervals, and No. 1 and No. 2 burners are put out. When No. 1 and No. 2 burners are turned off, air is taken in through the filters by the compressor and is compressed to about 50 pounds per square inch pressure and picks up some heat from compression. It then passes through the air heater where it picks up additional heat by indirect heat exchange with molten salt circulating in tubes at 800° to 820°. The molten salt gets its heat by circulation in tubes which run through the cracking cases during the process of combustion. The temperature of the air as it is discharged from the compressor on its way to the air heater is approximately 350°. The temperature of the air is increased by the salt solution to 685°, so that the salt heat exchanger raises the temperature 335°. The air then passes into one of the cracking cases and burns off the carbon which has been deposited by the cracking reaction of the catalyst. The carbon dioxide, carbon monoxide, water vapor, nitrogen and air then passes through the combustion case, which is filled with catalyst to permit the combustion of any oil fumes or carbon monoxide left in the fuel gases. These gases then proceed to the turbine and out of the stack. The compressor is a necessary part of the system because without the compressor there would be no means of providing the air necessary for its operation. The function of the compressor is to furnish enough air at about 50 pounds pressure to burn the carbon off the catalyst so that the cracking reaction can proceed. The gases produced drive the turbine or give energy to it. If its speed falls below 5180 RPM, the motor generator operates as a motor to bring it up to that speed. If the turbine exceeds 5180 RPM, the motor generator acts as a generator and delivers a little current which is absorbed in the operation of the plant.

Vose stated in his specifications that he found that when the regeneration step was carried out by means of air pressure of 17.5 pounds per square inch absolute the regeneration time was 90 minutes, while when the regeneration was carried out at 40.5 pounds per square inch absolute the regeneration time was cut to 15 minutes, resulting either in the diminution of the amount of catalyst necessary for a given throughput or greatly raising the capacity of a given amount of catalyst, but that the disadvantage of this pressure regeneration was the cost of compressing the air for use in the regeneration, and that he discovered that this cost could be reduced by utilizing the combustion products of pressure regeneration emerging from the catalyst for furnishing the power necessary, through the use of the turbo-compressor, for the compression of the regenerating medium. It was this process which was covered by the claims in his patent and which was followed in the defendant's installation. The patent did not claim but fully disclosed the use of the combination of a gas turbine as the prime mover, a compressor as the mechanical load, the induction motor, electrical load and alternating current supply line.

The defendant's apparatus is clearly described by the defendant's expert, Mr. Hutchins, in his testimony, as follows:

"The defendant's apparatus consists of a very complicated arrangement of apparatus set up for the purpose of manufacturing gasoline and other by-products of the cracking process. During this operation there appear large amounts of energy in the form of heat from the burning away of carbon that is deposited in the cracking chambers on a substance known as the catalyst which facilitates the process. In order to reclaim the energy so represented, the hot gases are conducted through a gas turbine, which in turn drives an air compressor which furnishes air for the process.

"This air for the process is heated in several different ways: first by compression as it goes through the compressor; and secondly, in a heat exchanger, which is referred to both by the operatives at the plant and in descriptive literature of the plant as a salt air heater, which, as I saw it, consisted of a means of circulating

molten salt through a series of tubes that this processed air passed over, and at the same time molten salt was circulated through these cracking chambers to pick up the heat used. The circuit is a closed circuit process. This air is taken in from the atmosphere and goes around through the process, picks up energy, goes through the turbine, gives up energy to drive the compressor, and then returns to the atmosphere through a stack.

"*In order to regulate the speed of the compressor,* which is driven by the turbine, an electrical machine is connected to the shaft; and this machine is of comparatively small size compared to the mechanical units involved, and there may be a certain amount of electrical power supplied or a certain amount of electric power taken away,—a rather minor amount of power in either respect because the machine acts in this case as a speed regulator rather than either a motor or generator.

"The whole process is a matter of setting up the most economical system for the purpose of manufacturing gasoline and its by-products." R. 90-91.

The Claims of the Patent in Suit

The patent in suit contains the two claims which are set forth below. The differences in the two claims are italicized. It will be noted that these consist of—

(1) The inclusion of an additional element of "control means" at the end of claim 1, and

(2) The specific inclusion in claim 2 of "an internal combustion engine" in place of the general description of a "mechanical prime mover" in claim 1.

| Claim 1 | Claim 2 |
|---|---|
| (1) A driving arrangement for a system having a mechanical and electrical load including, | (1) (The same) |
| (2) an induction machine mechanically coupled to the mechanical load and electrically coupled to the electrical load, | (2) (The same) |
| (3) an alternating current supply line connected to said induction machine and said electrical load, | (3) (The same) |
| (4) *a mechanical prime mover* adapted to drive said mechanical load and connected to drive said induction machine above its synchronous speed and thereby operate the same as a generator to absorb said electrical load, and | (4) *and an internal combustion engine delivering a power output greater than said induction machine and* adapted to drive said mechanical load and to drive said induction machine above its synchronous speed and thereby operate the same as a generator to absorb said electrical load. |
| (5) *control means for said mechanical prime mover interlocked with said alternating current supply line operable to shut down said prime mover in event of failure of said alternating current supply.* | |

## Claim 1

Claim 1 may be disposed of, so far as infringement is concerned, by the statement that there seems to be no evidence indicating that the structure of the defendant includes the control means, which is the last element of Claim 1, to-wit: "and control means for said mechanical prime mover interlocked with said alternating current supply line operable to shut down said prime mover in event of failure of said alternating current supply."

■ It seems to be the law that a patent for a combination of several known elements is not infringed by a device which omits one of the essential elements of the combination. In Stedman on Patents it is said on this subject: "A patent for a combination of several known elements is not infringed by a device in which less than all of them are used, even though the element omitted from the second device was immaterial, and totally unnecessary to the successful operation of the first combination, since neither the patentee nor the court can declare an element, made a material part of a claim, to be immaterial. An improved process, consisting of several old elements of combination, is not infringed by a process which omits one of the essential elements of the combination." (pp. 475–477, citing many cases.)

We do not understand that counsel for plaintiffs are insisting upon any relief based on infringement of Claim 1.

## Claim 2

The invention of the plaintiff as claimed in Claim 2 consists of the following elements in combination:

"A driving arrangement for a system having a mechanical and electrical load including,

"(1) an induction machine

"(a) mechanically coupled to the mechanical load and

"(b) electrically coupled to the electrical load,

"(2) an alternating current supply line

"(a) connected to said induction machine and said electrical load, and

"(3) an internal combustion engine

"(a) delivering a power output greater than said induction machine and

"(b) adapted to drive said mechanical load and to drive said induction machine above its synchronous speed, and

"(c) thereby operate the same as a generator to absorb said electrical load."

It will be seen that the combination consists of (1) an induction machine; (2) an alternating current supply line; and (3) an internal combustion engine. All of these elements are admittedly old, but plaintiffs contend the combination is an invention because it produces a new and useful result, to-wit, generating, and motoring when necessary. R. 241.

The defense contends there is nothing in common between the driving arrangement of Palmer and the installation of defendant that is not a well known device which has been applied in the prior art to other fields of use having varying objectives, and that it is not, therefore, patentable; that the combination of a prime mover, a mechanical load, and an induction machine capable of functioning both as a motor and generator, arranged on a common shaft, with the induction machine connected to an electrical supply line, is old, and disclosed in the prior art patents offered in evidence.

## Proceedings in the Patent Office

The file wrapper of the patent in suit is in evidence as Defendant's Exhibit U. When the application was first filed (March 8, 1937) it contained three claims, which were rejected by the examiner on the following ground: "Claims 1 to 3 are rejected as unpatentable over Dean in view of Griffiths. The Dean patent shows an *induction* motor 2 (See lines 61 and 62 of page 4) coupled to a turbine 2 and pump 1. No invention would be involved in substituting an internal combustion engine such as engine 21 of Griffiths for the turbine 3 of Dean."

Dean disclosed the combination of a prime mover, mechanical load, induction machine and alternating current supply, but the motor was not intended to function as a generator.

No appeal was taken. The applicant acquiesced in the rejection by cancelling the original claims and amending the application by substituting two new claims, which were allowed upon the argument and exhibits offered by the attorney for the applicant.

The original three claims claimed as new and as the invention the same elements in combination as Claim 2 of the patent in suit. The significant differences were that original Claim 1 stated that it was intended that the internal combustion engine drive the induction machine "*at or above* its synchronous speed"; Claim 2, that the engine should be governed to rotate the induction machine "*at about* its synchronous speed"; and Claim 3 made no reference to the relative speed the induction machine was to be driven. In none of the claims was it stated that the induction machine was intended to operate as a generator; whereas, Claim 2 of the patent in suit, as amended and allowed, stated that the engine was to drive the induction machine "*above* its synchronous speed" and "thereby operate the same as a generator" to absorb the electrical load of the plant to which it was coupled. Claim 1 was similar, excepting that it included a "prime mover" instead of "internal combustion engine", as included in Claim 2 and in the three original claims, and also included a "control means" not included in the original claims. No change was made in the drawings or specifications.

In the argument of counsel for the applicant, distinguishing the new claims from the claims of the Dean patent, it was stated:

"The Dean patent shows a duplex drive in which a pump 1 is driven, either from an induction motor or a steam turbine, or both. In the objects it is stated that it is desired to provide two independent power sources for the pump, so that if one fails the other will carry the load. In the specification, page 4, the pump is described as having an allowable operating speed of between '1760 and 1800 RPM', the motor is described as having a synchronous speed of 1800 RPM and the steam turbine is described as being governed at 1800 RPM and capable of carrying the full pump load at that speed. The turbine carries the full pump load only when the demand for exhaust steam is such that the pressure on the exhaust side drops below two pounds. The rest of the time the turbine requires the aid of the electric motor to carry the pump load. At no time does the turbine supply more power than is required by the pump. Further, the specification states distinctly that the permissible top speed of the pump is 1800 RPM. It seems obvious that Dean never intended his set to accomplish the purpose set forth and claimed by applicant." (i. e., to operate as a generator to absorb the electrical load of the plant.)

\*    \*    \*    \*    \*    \*

"\*  \*  \*  *Applicant can and does run a a number of mechanical devices from a single prime mover, not by line shafting but by absorbing an electrical load in addition to the mechanical load of the immediate machine.* (See affidavit of Warren M. Goon attached.) *This is a commercially important and radically new concept which the prior art, including Dean, does not even approach. It is respectfully submitted that this concept, as defined in the claims herewith, is clearly patentable.*" (i. e., the idea of operating a number of mechanical devices from the current generated by the induction machine, which the defendant's installation is not intended to do.) (Italics inserted.)

Counsel for the applicant also submitted, in support of the amendment, the affidavits, filed in the Patent Office July 15, 1937, of Goon and Hendrickson as to commercial use of the invention in the plants of the Goon Ice Cream Company (installed in April, 1937) and the Mather Spring Company, and articles in "Gas Age-Record and Natural Gas", July 8, 1937; "Gas Age", August 5, 1937, p. 24; "Gas", July 19, 1937, pp. 14, 15, 16, 48; "Refrigerating Engineering", August, 1937, pp. 85, 86, 128; "Steel", August 9, 1937, pp. 57, 58; all articles by Mr. Wenner, one of the plaintiffs here, except the editorial in "Gas Age". It does not appear whether at the time the record in the Patent Office showed that Mr. Wenner had an interest in the patent in suit. These articles purport to show the commercial possibilities of the increased sale of fuel gas to customers using induction

motors to drive compressors and blowers or other loads by the installation of internal combustion fuel gas engines of rated horsepower greatly in excess of the motor, for the purpose of driving the mechanical load and at the same time driving the induction motor as a generator above its synchronous speed so as to generate electricity for use in the plant, which it was claimed could be done at a large savings over the cost of current from the public utility. Without further action, the two new claims were allowed.

■ It seems to be the law that where a claim is narrowed in order to obtain allowance thereof by distinguishing it from a prior patent cited by the Patent Office, it cannot be broadened in an infringement suit so as to give the claim the larger scope which it might have had without the amendment. 2 Deller's Walker on Patents, Sec. 249, pp. 1215, 1217. On this subject, it was stated by the Court in the case of I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 47 S.Ct. 136, 141, 71 L.Ed. 335, as follows: "It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. Shepard v. Carrigan, 116 U.S. 593, 597, 6 S.Ct. 493, 29 L.Ed. 723. If dissatisfied with the rejection he should pursue his remedy by appeal; and where, in order to get his patent, he accepts one with a narrower claim, he is bound by it. Shepard v. Carrigan, supra, [116 U.S. at page 597, 6 S.Ct. at page 494, 29 L.Ed. 723]; Hubbell v. United States, 179 U.S. 77, 83, 21 S.Ct. 24, 45 L.Ed. 95. Whether the examiner was right or wrong in rejecting the original claim, the court is not to inquire. Hubbell v. United States, supra [179 U.S. at page 83, 21 S.Ct. at page 26, 45 L.Ed. 95]. Th applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers. Sargent v. Hall Safe & Lock Co., 114 U.S. 63, 86, 5 S.Ct. 1021, 29 L.Ed. 67; Shepard v. Carrigan, 116 U.S. 598, 6 S.Ct. 493 [29 L.Ed. 723], supra; Hubbell v. United States, 179 U.S. 85, 21 S.Ct. at page 24 [45 L.Ed. 95], supra. The patentee is thereafter estopped to claim the benefit of his rejected claim of such a construction of his amended claim as would be equivalent thereto. Morgan Envelope Co. v. Albany [Perforated Wrapping] Paper Co., 152 U.S. 425, 429, 14 S.Ct. 627, 38 L.Ed. 500. So where an applicant whose claim is rejected on reference to a prior patent, without objection or appeal, voluntarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he 'may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments which amount to a disclaimer.'" Weber Elec. Co. v. E. H. Freeman Electric Co., 256 U.S. 668, 677, 41 S.Ct. 600, 65 L.Ed. 1162.

In the case of Schriber–Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132, the Court held:

"1. The claims of a patent are interpreted in the light of the specifications, but with reference also to its file-wrapper history. [311 U.S. at page 217, 61 S.Ct. 238.]

"2. *It is a rule of patent construction that a claim in a patent must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what has thus been eliminated from the patent.* [311 U.S. at page 220, 61 S.Ct. 239.]

"3. While this rule is most frequently invoked when the original and cancelled claim is broader than that allowed, the rule and the reason for it are the same if the cancelled or rejected claim be narrower. [311 U.S. at page 221, 61 S.Ct. 239.]" (Italics inserted.)

On this subject the Court, in its opinion, stated (311 U.S. at page 220, 61 S.Ct. 239, 85 L.Ed. 132):

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. Shepard v. Carrigan, 116 U.S. 593, 6 S.Ct. 493, 29 L.Ed. 723; Sutter v. Robinson, 119 U.S. 530, 7 S.Ct. 376, 30 L.Ed. 492; Roemer v. Peddie, 132 U.S. 313, 10 S.Ct. 98, 33 L.Ed. 382; Phoenix Caster Co. v. Spiegel, 133 U.S. 360, 10 S.Ct. 409, 33 L.Ed. 663; Hubbell v. United States, 179 U.S. 77, 21 S.Ct. 24, 45 L.Ed. 95; Weber Electric Co. v. E. H. Freeman Electric Co., 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 141, 71 L.Ed. 335. The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer. Smith v. Magic City Kennel Club, 282 U.S. 784, 790, 51 S.Ct. 291, 293, 75 L.Ed. 707; Weber Electric Co. v. E. H. Freeman Electric Co., supra, 256 U.S. 677, 678, 41 S.Ct. 603, 65 L.Ed. 1162; I. T. S. Rubber Co. v. Essex Rubber Co., supra, 272 U.S. 444, 47 S.Ct. 141, 71 L.Ed. 335. The injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest. See Leggett v. Avery, 101 U.S. 256, 259, 25 L.Ed. 865.

"True, the rule is most frequently invoked when the original and cancelled claim is broader than that allowed, but the rule and the reason for it are the same if the cancelled or rejected claim be narrower. Morgan Envelope Co. v. Albany Paper Co., 152 U.S. 425, 429, 14 S.Ct. 627, 629, 38 L.Ed. 500; Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210, 213; see Computing Scale Co. v. Automatic Scale Co., 204 U.S. 609, 620, 621, 27 S.Ct. 307, 311, 312, 51 L.Ed. 645; cf. in case of disclaimer Altoona Publix Theatres, Inc. v. Tri-Ergon Corporation, 294 U.S. 477, 492, 493, 55 S.Ct. 455, 461, 462, 79 L.Ed. 1005."

Original Claims 1, 2 and 3 were similar to Claim 2 of the patent in suit in the combination of elements, i. e., internal combustion engine, induction machine having a mechanical and electrical load, and alternating current supply. They differed from Claim 2 only in the concluding language of each claim, as shown below.

## Original Claim 1

"* * * and an internal combustion engine mechanically coupled to drive said induction machine *at or above its synchronous speed.*"

## Original Claim 2

"* * * and an internal combustion engine mechanically coupled to said induction machine and to said mechanical load and governed to rotate said induction machine *at about its synchronous speed* whereby the current consumed by said induction machine from said supply line becomes negligible."

## Original Claim 3

"* * * and an internal combustion engine mechanically coupled to said induction machine to drive the same and thereby drive said mechanical load whereby the current consumed by said induction machine from said supply line is reduced."

## Claim 2 of patent in suit

"* * * and an internal combustion engine delivering a power output greater than said induction machine and adapted to drive said mechanical load and to drive said induction machine *above its synchronous speed, and thereby operate the same as a generator* to absorb said electrical load."

The Dean patent upon which the rejection of the original three claims was based made no claim to the result of generating or driving the induction machine above its synchronous speed, and it was upon this limitation in the Dean patent that the attorney for Palmer urged the examiner to allow the amended claims, because they were limited to the operation of the induction machine as a generator. The evidence is that the induction machine in the installations of Palmer which appear in evidence only motored in order to start the engine, and that the rest of the time it operated as a generator. R. 214. On the other hand, Plaintiffs' Exhibit 7, a chart showing the average motoring and generating of defendant's installation, September, 1940 to October, 1946, inclusive, shows that, on the average, for 51⅚ months the induction machine motored, for 21⅙ months on the average it generated, and for one month the average was 0. The testimony is that during the entire period there was a net consumption of electrical energy by the motor generator:

"Q. Referring to Exhibit No. 2, marked for identification,—during the period of approximately six years, which this record covers, I note that sometimes the motor generator was on the generating side and sometimes on the motoring side. During this period was there a net consumption of electrical energy or any output of electricity? A. There was a net consumption of electrical energy by the motor generator." Harron deposition, p. 27.

It would seem that the operation of the defendant's installation came more closely under the terms of the original claims of Palmer, in that the induction machine was operated *at or about its synchronous speed,* and was not intended to operate as a generator to absorb the electrical load in the plant. The main purpose of the induction machine in the defendant's installation, as testified by the defendant's witnesses, was to bring the turbo compressor up to the predetermined fixed speed, necessary in the operation of the system, until sufficient energy was picked up by the turbine to carry the load, and, where there was excess of power generated by the turbine, to act as an additional load for the turbine to carry, so as to bring down its speed to the desired point. This resulted in the generation of a small amount of electrical current which was absorbed by the plant.

In view of the fact that the original claims of Palmer were rejected on reference to the Dean patent, without objection or appeal, and the applicant voluntarily restricted himself by amendment of his claims to the specific purpose of generating, in order to differentiate from Dean and to obtain a patent, he may not give to the amended claims the scope which they would have had without the amendment, and thus cover the installation of defendant. As so construed, the installation of the defendant does not seem to infringe.

### Prior Art Patents

The contention of the defendant that the combination of elements used in its installation alleged to infringe is shown in the prior art patents seems to be sustained by an examination of those patents. The prior art patents offered in evidence and discussed in the briefs, in the order of their issuance, are the following:—No. 1,267,386, to Dean, on "Heat Balance Duplex Drive", filed January 25, 1917, renewed March 19, 1918, issued May 25, 1918 (Defendant's Ex. D); No. 1,270,561, to Smith, on "Power System", filed April 9, 1917, issued June 25, 1918 (Defendant's Ex H); Br. No. 120,889, to Westinghouse, on "Improvements In Or Relating To Motor Power Plant", filed October 29, 1918, accepted February 13, 1919 (Defendant's Ex. E); No. 1,553,119, to Stein, on "Power Installation", filed August 15, 1922, issued September 8, 1925 (Defendant's Ex. G); No. 1,680,025, to Losel, on "Turbine Locomotive", filed August 17, 1923, issued August 7, 1928 (Defendant's Ex. C); No. 1,978,837, to Forsling, on "Gas Turbine Power Plant", filed July 6, 1933, issued October 30, 1934 (Defendant's Ex. F); No. 2,016,890, to Chesnut, on "Electrical Load Control System", filed April 4, 1933, issued October 8, 1935 (Defendant's Exhibit R); No. 2,167,698, to Vose, on "Method For Regenerating Catalytic Masses", filed January 17, 1936, issued August 1, 1939 (Defendant's Ex. B).

All of these patents disclose the elements of a prime mover, mechanical load and induction machine contained in the Palmer patent, excepting Dean, which is similar excepting that his induction machine did not generate. This was admitted by Mr. Palmer in his testimony, as follows:

"Q. Mr. Palmer, *all these patents that you have discussed show a combination of prime mover, mechanical load and motor generator, do they not?* A. Repeat your question, please. (Question read.) A. Yes—by motor generator, you mean induction generator, do you not?

"Q. *Yes.* A. Induction machine?

"Q. Yes. A. Yes sir.

"Q. And they all show the capacity and describe the capacity of the motor generator or induction machine to function either as a motor or as a generator, dependent upon whether the speed of the prime mover is adequate to furnish all the power necessary to drive the load? A. Not all of them.

"Q. Which does not? A. The Dean patent specifically states that he is not going to operate above synchronous speed; to operate at synchronous speed, but not above synchronous speed.

"Q. The Dean patent does not show a motor generator functioning as a generator? A. It certainly does not.

"Q. If, however, the speed of the turbine or compressor should exceed that specified in the specification, namely, 1800 RPM, then it would function as a generator, would it not? A. Yes; but who would make it exceed the speed?

"Q. Suppose it did; then it would function as a generator? A. Yes, it would.

"Q. *That is the difference between Palmer and Dean, that in your case the power of the prime mover is greatly in excess of that required to drive the load and mechanical load?* A. *That is right.* We have an internal combustion engine; in addition to stating a prime mover, you will recall our second claim mentions an internal combustion engine; I should like to make that difference.

"Q. *Now, all of these patents that you have discussed, and that Mr. Hutchins has*

*discussed apply this old combination, of prime mover, mechanical load, and motor generator or induction machine, to different uses in different combinations for different objectives?* A. *And different results.*

"Q. From those of Palmer and those of Sun Oil; that is true, is it not? A. Yes, they are performing a different function than you are at Sun Oil." R. pp. 239, 240.

"Q. *I am asking you to state what new results you have accomplished,* because you have simply recited what is performed in these prior art references, as I understand it. *What new thing have you done?* A. *We are doing a job and producing machinery different than anything mentioned in the patents just recited.*

"Q. *What is that new result?* A. *We are generating.*

"Q. *That is your new result?* A. *Generating, and, at the same time, we can motor, if it is necessary.*

"Q. *Do not all these patents say that, that their induction machine both motors and generates? Do they not all say that?* A. *Not necessarily.*

"Q. *Which of them does not, except Dean?* A. *One patent in particular, Dean, mentions specifically he is not going to run above 1800 RPM."* R. pp. 241, 242. (Italics inserted.)

The patents above referred to disclose the following:

The Dean Patent No. 1,267,386, May 25, 1918, (Defendant's Exhibit D) discloses a driving arrangement consisting of the combination of (1) a prime mover (steam turbine 3 in Fig. 1), (2) a mechanical load (such as a pump 1 in Fig. 1), (3) an induction machine or motor (2 in Fig. 1), (4) a "suitable source of electric energy so as to operate therefrom", and (5) automatic speed regulating devices. The speed of the turbine is regulated by the governor (15), at or slightly below the synchronous speed of the induction machine; but, according to the testimony of Mr. Hutchins, by an adjustment of the governor to allow a slightly higher speed of the turbine, the induction machine could operate as a generator. R. pp. 98–99.

*The Smith Patent No. 1,270,561,* June 25, 1918, (Defendant's Exhibit H) includes the same combination of prime mover (turbine 9), mechanical load (exciter 5 or other "auxiliary"), an induction machine (alternating current motor 8).

The turbine in this patent carries the full load except that when its speed falls below the synchronous speed of the motor the latter takes up the load. In ordinary operation, as set forth in the specification, the governor is set for "a certain maximum speed, preferably somewhat above the synchronous speed of the motor 8". When it goes above the synchronous speed, the motor would seem to act as a generator Smith utilizes the same combination as Palmer does—a prime mover, mechanical load, and an induction machine, as shown in this patent, and in the other prior art patents, and the operation is similar to that of defendant and Stein in that the power of the turbine at all times approximates that required to drive the mechanical load, the induction machine taking care of fluctuations in the driving power of the turbine by alternating motoring or generating.

*Westinghouse British Patent No. 120,889,* February 13, 1919, (Defendant's Exhibit E) also discloses a prime mover (turbine 18), mechanical load (pump or compressor 14–15), induction machine (17), and current from "any suitable source". The operation of the motor is described in the specification as follows: "The motor 17 may receive current from any suitable source and is preferably of the induction type. Where an induction motor is employed as shewn steam could be entirely cut off from the turbine 18 and the motor would carry the entire load. If the turbine developed a certain amount of power it would relieve the motor of load, by just that amount; and if the turbine is furnished with sufficient steam to develop the full power required by the auxiliaries (pumps) it would, by having its governor properly adjusted, take the entire load of the motor, and under certain conditions *it would not only assume the load of the motor but cause the motor to operate as a generator and deliver current.* In fact, if the turbine governor is properly adjusted the turbine may assume any pro-

portion of the load, depending on the amount of steam delivered to it. The governor of the turbine 18 will preferably be in the nature of an automatic stop governor, that is, will be adjusted so that it will only act to prevent the turbine from running away." P. 2, lines 26–39. (Italics inserted.)

The disclosure of this patent seems a complete anticipation of what is common to the Palmer patent and the defendant's construction.

*The Stein Patent No. 1,553,119,* September 8, 1925, (Defendant's Exhibit G) discloses a prime mover (turbine 10), mechanical load (pump 9), an induction machine (asynchronous dynamo-electric machine 11), all on a common shaft. This combination was not claimed by Stein as an invention, but he utilized it in his device. It specifically disclosed that the induction machine or motor (11) in the operation described "will be driven as a generator to supply power to the line".

*The Losel Patent No. 1,680,025,* August 7, 1928, (Defendant's Exhibit C) is for a different objective, a turbine locomotive, but it discloses a prime mover (turbine T), an induction machine (G) connected to an alternating current supply line, and a mechanical load (the locomotive). The induction machine is intended to function both as a motor and as a generator. This is apparent from the specification, which states: "In the embodiment shown the dynamo electric unit g1 functions both as a motor and a generator, as for example being in the form of an asynchronous generator, * * *". P. 1, lines 74–77.

*The Forsling Patent No. 1,978,837,* October 30, 1934, (Defendant's Exhibit F) discloses the elements of the combination in the Palmer patent: (1) the prime mover (gas turbine 22 in Fig. 1), (2) mechanical load (compressor 27 in Fig. 1), (3) induction machine (dynamo-electric machine 29 in Fig. 1), and (4) alternating current supply line (30 in Fig. 1). On a common shaft are gas turbine (22), blower or compressor (27), and dynamo-electric machine (29) connected to the alternating current supply line (30). The air from the blower goes to a combustion chamber (11), gas

from which passes through conduits (28) and (21) and drives turbine (22). Turbine (22) drives the compressor (27). The patent states: "Under ordinary conditions the dynamo-electric machine operates as *a motor,* that is, takes power from line 25 or from the first power set and transmits it to the blower 27. The dynamo-electric machine 29, however, may also operate as a generator which may be the case if the load demand from the first power set decreases suddenly. *In this case the mechanical load output of the turbine 22 is partly transmitted to the machine 29 and converted therein into electrical energy supplied to line 25."* P. 2, lines 14-24. (Italics inserted.)

At the bottom of Fig. 2 is another similar unit, having on a common shaft a turbine (37), a compressor or blower (46), and an induction machine (47) connected to an alternating current supply line (48). "Coupled with the blower in accordance with my invention is a dynamo-electric machine 47 corresponding to the machine 29 of Fig. 1 and being connected by a line 48 to the electric line 44. The operation is similar to that of the arrangement of Fig. 1." P. 2, lines 108-113.

This operation apparently is similar to any operation that Palmer and the defendant's construction have in common, while the arrangement of the power unit (gas turbine, compressor, motor generator, and gas generator) corresponds to the arrangement of defendant's power unit (gas turbine, compressor, motor generator, and catalytic cracking or gas generating system). Whether the motor generator (29 in Fig. 1 or 47 in Fig. 2) operates as a generator or motor depends on whether the turbine is delivering more or less power than is required to operate the compressor or blower at the required speed. Defendant's witness Hutchins testified on the subject of this patent (R. 111), after explaining the substantial identity between one of the two Forsling power units and defendant's power unit: " * * * in this Forsling patent one of these combinations lifted out of the patent would be the exact equivalent to what is being used in the Sun refinery as a part of the Houdry equipment".

If Claim 2 of Palmer is capable of a construction broad enough to cover defendant, it would seem to be anticipated by Forsling. In both Forsling and the defendant the prime mover is a gas turbine (37 in Fig. 2). The compressor (46) drives and heats air, which goes through a heat exchanger (42) in which it is further heated, and thence through a combustion chamber (11-12) where it is mixed with combustible material and further raised in temperature, the hot gases then flowing through a channel (39) to the gas turbine (37), which drives the compressor. The induction machine (47), coupled to the turbine (46), functions both as a motor and as a generator, dependent upon changes in the load on the compressor. A difference between Forsling and defendant's installation is that defendant has adapted the Forsling arrangement to a catalytic cracking plant, the combustible material in the combustion chamber being the carbon or coke burned off the catalyst, instead of oil, as in Forsling.

*The Chesnut Patent No. 2,016,890,* October 8, 1935, (Defendant's Exhibit R) also discloses a prime mover (turbine 16), a mechanical load (pump 12), and an induction machine (8), capable of acting either as a motor or generator. Chesnut expressly contemplates the use of an internal combustion engine as the prime mover, because he states: "The prime movers may be of any suitable type, such as steam turbines, internal combustion engines or water wheels * * *".

It is specifically provided also in the Chesnut device that the motor is designed to generate because the specification states: "In accordance with my invention, I provide one or more auxiliary prime movers for substantially directly reducing electrical load. Thus, in almost any cases where electrical power is used commercially, there are electric motors for operating mechanical loads, and my invention includes the mechanical coupling of the auxiliary prime movers to these electric motors or to their loads and so controlling these prime movers from any of the above mentioned control devices that the power output of the prime mover may be varied in a manner to control the electrical load. Thus by increasing

the power output of the prime mover it can be made to assume any desired fraction of the mechanical load and thereby reduce the electrical power required by the motor which drives this load. Furthermore, if desired and if the motor can be made to operate in a regenerative manner, *the power ouput of the prime mover may even be increased to such an extent that it operates the motor as a generator, thereby to pump electrical power back into the power supply circuit or system.*" (Italics inserted.)

The foregoing would seem to describe the objective and purpose which the plaintiffs argue is the merit of the Palmer invention. Mr. Wenner, in his examination (p. 202), stated that it was Chesnut's object, when the demand for electrical energy was high, to cause the motor generator to function as a generator and thus reduce the high cost of electrical energy. A reference to the argument made by the attorney for Palmer in the Patent Office in support of the allowance of amended claims 1 and 2, to distinguish from the Dean reference, shows that it was on the ground that the new Palmer claims were limited to the operation of the induction machine as a generator.

*The Vose Patent No. 2,167,698,* (Defendant's Exhibit B) applied for January 17, 1936, issued August 1, 1939, on "Method for Regenerating Catalytic Masses", which covers the defendant's process. The date of the application for this patent was 14 months previous to that of the application of Palmer, but the date of the Palmer invention has been carried back prior to that time. Mr. Wenner, one of the plaintiffs, and an engineer, admitted in his examination that Vose disclosed the Palmer invention. R. 210. This patent shows in Fig. 1 the motor generator (M), the pump or compressor (14), and the turbine (15). The motor generator is described as acting "as a motor when current is supplied to it in starting up and then as a generator when full speed has been reached". These elements are fully disclosed but not claimed in this patent.

Our conclusion, from a consideration of the foregoing patents, is that the defend-

ant's combination alleged to infringe was fully disclosed in the above prior art patents, none of which, excepting Dean, was before the Patent Office.

We are further of the opinion that the claims of the plaintiffs' patent, if construed to cover operation of the induction machine or motor generator at or about its synchronous speed, are invalid in view of the prior art.

*Infringement*

On the subject of alleged infringement, defendant contends that it has no internal combustion engine in its installation and that, therefore, it does not respond to that element of Claim 2 of the patent in suit.

Defendant further contends that if, as contended by plaintiffs, the defendant's turbine and compressor together constitute part of an internal combustion engine, the compressor of the defendant cannot be considered a mechanical load but is a part of the engine, and defendant's installation would not respond to the plaintiffs' claim in that respect.

The plaintiffs contend that the gas turbine of the defendant is an internal combustion engine within the terms of the patent. Mr. Palmer testified on this subject as follows:

"Q. The compressor" (of defendant) "is a necessary adjunct to make the engine operate? A. Correct."

"Q. In fact, in order to get internal combustion, you must have the turbine full of expanding products of combustion? A. Right.

"Q. You get that operation in the defendant's apparatus by a whole series of elements, from the compressor to the salt heat exchanger, to the catalytic cracking chamber, to the catalytic combustion chamber, beyond the catalytic chamber, down to the turbine itself; all those elements are in your view necessary to operate the turbine? A. That is correct."

*     *     *     *     *     *

"Q. In other words, combustion, ignition, burning and expansion are all es-

sential features of an internal combustion engine? A. That is right." (R. 61–63.)

\* \* \* \* \* \*

"A. The internal combustion engine I am talking about is the compression of air, addition of fuel, combustion and expansion. How you get your compression or how you get your compressed air is immaterial, *as far as the definition of cycle of the internal combustion engine.* \* \* \* May I add that the compressor is a necessary adjunct in order to make the cycle operate." R. 64, 65. (Italics inserted.)

In the defendant's operation, the combustion is in the still or cracking case, not in the turbine, while the combustion in the internal combustion engine of the plaintiffs is in the cylinders of the engine. The compression in defendant's construction that forces the gas to the point where it is ignited is in the compressor, while the compression of the gas mixture in the plaintiffs' engine takes place in the cylinders of the engine. The ignition of the mixture in the defendant's construction is in the still, while the ignition of the gas mixture in the plaintiffs' engine is in the cylinders of the engine. The compressor or mechanical load referred to in plaintiffs' Claim 2, as disclosed in the patent, and as illustrated by the plaintiffs' installations referred to in the record, is not a part of the engine.

The Court may look to encyclopedias and dictionaries for information when necessary to go outside the record. Werk v. Parker, 249 U.S. 130, 39 S.Ct. 197, 63 L.Ed. 514; Baker v. F. A. Duncombe Mfg. Co., 8 Cir., 1906, 146 F. 744; Beer v. Walbridge, 2 Cir., 1900, 100 F. 465.

Some definitions of an internal combustion engine, as they appear in standard engineering works, are as follows (italics are inserted):

From "The Internal Combustion Engine", by Ricardo (1922), p. 5: "The action of the internal combustion engine relies upon the heating of air by means of fuel burned *within the cylinder.* The combustion causes a rapid rise of temperature in the gases present, with consequent rise of pressure, which is utilized upon the piston."

From "Chamber's Technical Dictionary" (1940), p. 454: "*Internal combustion engine*—an engine in which heat is added to the working agent (air) by the combustion of a gaseous liquid or pulverised solid fuel *within the cylinder,* and converted into mechanical work through a piston."

P. 367: "*Gas Engine*—an internal combustion engine, running on the constant volume or Otto Cycle, in which gaseous fuel, such as town or producer gas, is mixed with air to form a combustible mixture *in the cylinder* fired by a spark".

From "Internal Combustion Engines", by Jennings and Obert (1944), p. 1, explaining the Otto Cycle above referred to:

"This cycle is typical for all reciprocating spark-ignition engines. The events of this cycle are:

"(1) An intake stroke to draw a combustible mixture *into the cylinder* of the engine;

"(2) A compression stroke to raise the temperature and pressure of the mixture;

"(3) Ignition and combustion of the mixture, with the consequent liberation of energy raising the temperature and pressure of the gases and thus accelerating the piston downward on the expansion or power stroke;

"(4) An exhaust stroke to sweep the cylinder free of burned gases".

From "Internal Combustion Engines", by Officers of the Department of Marine Engineering, U. S. Naval Academy (1937): "In the internal combustion engine, combustion takes place *in the cylinder* of the engine itself \* \* \*".

From "Van Nostrand's Scientific Encyclopaedia", 1947 Ed., p. 792, (referred to at R. 122, Defendant's Exhibit S): "The internal combustion engine is one in which combustion of a fuel takes place *within the cylinder* \* \* \*."

From "Internal Combustion Engines", by Streeter, 1929 Ed. (referred to at R. 122, Defendant's Exhibit T): "In the internal combustion engine combustion takes place directly *in the cylinder,* that is, the chemical energy is changed into heat energy in the cylinder".

From the case of Barber v. Otis Motor Sales Co., 2 Cir., 271 F. 171, 173, p. 273: "Internal combustion engines are engines in which the fuel charge, consisting of a combustible gaseous mixture, is ignited and exploded inside of the engine; the sudden explosion of the gases producing the combustion serving to force down the piston *in the cylinder*, which imparts motion to a crank shaft or other part. * * * Such engines have an inlet valve and an exhaust valve, which must open or be opened at proper times for the admission of the fuel gas to the engine and for the discharge of the exploded gases from the engine."

Similar definitions of units used in defendant's installation are:

From "Van Nostrand's Scientific Encyclopaedia", p. 632: *"Gas turbine*—the gas turbine is a means of producing mechanical work from heat energy, using a gas as the working medium * * *. In the gas turbine a stationary nozzle discharges a jet of gas (usually the products of combustion against the blades on the periphery of a turbine wheel. The jet is thereby deflected and slowed while the blades receive an impulse force which is transmitted as a mechanical torque to the shaft. * * * Compared to the internal combustion engine the turbine is compact and high speed. Gas turbine speeds of 10,000 are not uncommon. But because of the volume of the compressor and combustion chamber, and because much of the turbine output is absorbed in the turbine plant itself, the advantage of compact size is not so likely to be realized, and often it is the internal combustion engine that is the more compact".

From Volume 1, "Jones' Engineering Encyclopaedia", 1941 Ed., p. 553G: *"Gas turbine*—a gas turbine is a rotary prime mover or power-producing machine in which combustion gases of an explosive mixture of gas and air impinge at high pressure upon the blades of a turbine wheel or rotor in a manner similar to that in which steam impinges upon the blades of a steam turbine".

From the above work, p. 1325T: *"Turbo-compressor*—a turbo-compressor is a multi-stage centrifugal compressor. In principle, it is like the high-lift turbine pump; the air, upon entering the impeller near the center, is thrown outward by the blades, and its kinetic energy, due to the high velocity, is changed into pressure in fixed diffuser channels, and led back toward the center to the inlet of a second impeller, and so on, the pressure increasing with each stage".

In view of the evidence in this case and of the foregoing definitions of an internal combustion engine and of gas turbines, which seem to clearly differentiate between the two, we conclude the defendant's gas turbine is not an "internal combustion engine" as recognized by engineering literature, within the meaning of Claim 2 of the patent in suit.

As to the claim of plaintiffs that the Palmer invention consists of a combination of old elements producing a new and useful result, we find that the new use or purpose of plaintiffs' invention, which the applicant urged as novel, and upon the basis of which the amended claims were apparently allowed, was summarized before the examiner as follows:

*"Applicant can and does run a number of mechanical devices from a single prime mover,"* (internal combustion engine) "not by line shafting but by absorbing an electrical load in addition to the mechanical load of the immediate machine. * * * This is a commercially important and radically new concept which the prior art, including Dean, does not even approach. It is respectfully submitted that this concept, as defined in the claims herewith, is clearly patentable."* Defendant's Exhibit U, p. 11. (Italics inserted.)

The claims to which the above statement was addressed provided that the engine was to drive the induction machine always *above* its synchronous speed to operate the same as a generator to absorb the electrical load of the plant and thereby run a number of mechanical devices from a single prime mover.

That was not the use or purpose of the defendant's construction, as appears from the testimony. The evidence is that the defendant's induction machine operates most of the time it is functioning as a motor, as

when the turbine falls below its desired speed, and operates as a generator only when the turbine exceeds the desired speed, when it functions as a speed regulator and delivers a little current to the line. An illustration of the manner in which the defendant's installation functions, was given by Mr. Palmer, when he testified as follows:

"Q. I mean to say if the power of the turbine were greater, as it would be on a very cold day, you would be more likely to generate current, would you not? A. You could generate more current, yes.

"Q. That is, the induction machine is more apt to act then as a generator, and not as a motor? A. You see the work of expansion is greater necessarily than the work of compression, and enough more so to actually generate, which we know we can do. A cold day simply means that the air occupying less volume per pound on a cold than on a hot day, you could run more air into the cracking units; and since you could supply more oxygen, you could get more heat out: consequently, you could generate more than you would ordinarily on a warmer day.

"Q. So, Mr. Palmer, on the day that you were out, conditions were rather favorable to the induction machine functioning as a generator? A. It would seem so.

"Q. And at that time the compressor was running at almost the ideal speed that you want the compressor to have; that is, the turbine was generating just about enough power to drive the compressor at the desired speed, with very little variation above or below the desired speed? That is true, is it not? A. Yes; there was some generation at times there.

"Q. Yes, I remember clearly, and agree with you that at that time a needle, indicating whether the induction machine was generating or motoring, moved back and forth over a zero line without much margin favorable to either; in other words, that the turbine was driving the compressor with only a negligible amount of extra current construction, and only a negligible amount of current supply. A. That is what we saw at the time; but it is in the realm of absolute possibility you could generate more.

"Q. I agree that that is possible by reorganizing the apparatus to generate a lot more. I am speaking of the operation at the Toledo plant of the Sun Oil Company, which is all we have to concern ourselves with. A. But you were generating at times, and motoring at times.

"Q. You saw at that time a number of other records, indicating usually that the induction machine was motoring. A. I could see the charts.

"Q. We went over the records? You asked to see them? A. Yes, we did. I looked at the charts. Parts of the time it would be motoring and part of the time it would be generating, reverting from one to another. I assume that was when they were transferring from one cracking unit to another in the burn-out process." R. 74-76.

This testimony of Mr. Palmer confirms the testimony of defendant's witnesses on the subject.

We conclude that the construction, use or purpose of the defendant's installation has little in common with the claimed new use and purpose of the plaintiffs' invention and construction.

Assuming the plaintiffs' patent is valid, we are of the opinion the defendant's construction does not infringe.

### The Question of Validity

Although the foregoing conclusions seem to make it unnecessary to pass upon the question of invalidity, we are admonished by the Supreme Court that "the better practice usually is for the court to inquire fully into the validity of the patent" (Sinclair & Carroll Co. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; see also Pennington Engineering Co. v. Spicer Mfg. Corporation, 6 Cir., 165 F.2d 59, 61), and, therefore, we deem it proper to discuss this subject.

On the subject of the duty of the Court to protect the public against the claims of an alleged inventor, it was said by the Court in the case of Frank Adam Elec. Co. v. Colt's Patent Fire Arms Mfg. Co.,

8 Cir., 1945, 148 F.2d 497, 502: "We think that the Supreme Court, in its more recent opinions in patent cases, has indicated that presumptions based upon the issuance of patents or upon the mere fact that a patented device differs from prior art disclosures in structure or design, may not be used to transmute the products of mechanical skill into patentable inventions. It must be as much the duty of the court in a patent case to protect the public against having to pay tribute to a patentee who is not in any true sense an inventor or discoverer, as to protect the patent rights of one who is a real inventor. See Cuno Engineering Corporation v. Automatic Devices Corporation, supra (314 U.S. [84, at page 92], 62 S.Ct. 37, 86 L.Ed. 58) ; Muncie Gear Works, Inc., v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171."

All of the elements of the combination of the claims of the patent in suit were admittedly old. Plaintiffs claim that the Palmer driving arrangement or combination produces a new and beneficial result, to wit, generating, and that this was invention over the prior art. R. 214.

The specifications describe the invention as a "driving arrangement" which in combination "possesses certain desirable characteristics not found in its component parts" (p. 1, col. 1, lines 1-10), and describes these claimed advantages or improvements as follows:

(1) "A considerable saving in the cost of operating the compressor load will be effected." P. 1, col. 2, lines 14-16.

(2) "The power generated by the induction generator will be utilized by the remaining current consuming devices 20 and 21 (lamps and motors) on the premises". P. 1, col. 2, lines 29-31.

(3) "The induction generator acts as a speed control for the engine 9 since it becomes part of the engine load and its loading effect increases tremendously with a slight increase in speed. * * * if the engine 9 is properly chosen, its speed will be controlled and reduced before the generator output reaches this maximum point." P. 1, col. 2, lines 35-46.

(4) "The induction machine 3 also serves to prevent a reduction in speed at which the compressor is driven. * * * the induction machine 3 will pick up the load and act as a motor, drawing current from supply lines 4 and 4a and driving the compressor. * * * without need for any control devices whatever." P. 1, col. 2, lines 48-55 and p. 2, col. 1, lines 1-4.

The above statements were apparently included in the specifications in an effort to comply with Title 35 U.S.C.A. § 33, requiring the inventor to "particularly point out and claim the part, improvement, or combination which he claims as his invention or discovery". None of the improved functions pointed out in the specifications quoted above were claimed by Mr. Palmer in his testimony as new over the combinations in prior art, excepting what is apparently intended to be covered by item (2) above, which refers to generating current to be used to run other current consuming devices on the premises.

There seems to be some doubt from the decisions of the Supreme Court whether a new use of an old combination of elements is patentable. (See article on "Patentability of a New Use for an Old Composition of Matter", in "Journal of the Patent Office Society", Vol. XXIX, No. 11, 787.) However, the trend of the later cases seems to be that such use is not patentable. Paramount Publix Corporation v. American Tri-Ergon Corporation, 1935, 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Cuno Engineering Corporation v. Automatic Devices Corporation, 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Sinclair & Carroll Co. v. Interchemical Co., 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; Dow Chemical Co. v. Haliburton, Oil Well Cementing Co., 1945, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973.

The internal combustion engine, which was the only unit that the patentee added to the hook-up then in use in the plants of the Goon Ice Cream Company and the Gerber Grocery was old and well-known. Its use to mechanically drive any machine or other mechanical load to which it was adapted, such as a motor generator, was old and well-known. The motor generator was

old and well-known; and its use as a motor when running below its synchronous speed, and as a generator when driven above its synchronous speed, was old and well-known. (See Defendant's Exhibit V and Defendant's Exhibit U, p. 47.) Such use appears in prior art patents which have been discussed. To mechanically connect an internal combustion engine to a mechanical load and to an induction machine or motor generator connected to an alternating current supply line of a public utility, the engine delivering a power output greater than the induction machine, so as to be able to drive it above its synchronous speed and generate current, would seem to be using old mechanisms operating in combination in the same manner they functioned as separate units. In view of the prior art, this does not seem to involve invention or anything more than the mechanical skill to be expected of one versed in the art.

The evidence on the subject of utility is very meager. We cannot accept as facts the contents of the ex parte affidavits, or the self-serving statements of Mr. Wenner, one of the plaintiffs, in magazine articles, submitted to the Patent Office Examiner in support of the amended claims, as evidence of utility or commercial success, in view of the fact that the installations therein referred to were apparently made in 1936 and 1937, while this case was tried in 1947, and there is no evidence on the record in this case as to the continuing results of these operations or other installations, if any, of the plaintiffs' device in the ten years which intervened. So far as appears, it may be that they were found of no utility and were discontinued in use for that or some other reason and that the invention had not been useful or commercially successful, or it may be otherwise. No good reason appears for failure to offer such evidence, if available.

We find it unnecessary to pass upon other questions raised in this case.

## Conclusion

For the foregoing reasons we find the claims of the patent in suit invalid and not infringed.

We are of the opinion that, under the provisions of Rule 52 of the amended Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the foregoing opinion sufficiently sets forth the findings of fact and conclusions of law in this case. However, if counsel upon either side desire categorical findings of fact and conclusions of law in this case, they may be prepared and submitted to the Court within 10 days.